Elvira VECCHIONE, Plaintiff,

v.

Helene WOHLGEMUTH et al.

Walter BURESS, Individually and on
behalf of all others similarly
situated, Plaintiff-Intervenor,

v.

Frank BEAL et al., Defendants.

Civ. A. No. 73–162.

United States District Court,
E. D. Pennsylvania.

Dec. 11, 1979.

Community Legal Services, Inc., Philadelphia, Pa., for plaintiff, Elvira Vecchione.

David L. Ferleger, Herbert Newberg, Philadelphia, Pa., for plaintiff-intervenor Walter Buress.

Robert Hoffman, Harrisburg, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This opinion will consider a motion for counsel fees pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, in a civil rights case brought under 42 U.S.C. § 1983.[1] The history of this litigation has been chronicled in three opinions: *Vecchione v. Wohlgemuth*, 377 F.Supp. 1361 (E.D.Pa.1974) (*Vecchione I*), *Vecchione v. Wohlgemuth*, 426 F.Supp. 1297 (E.D.Pa.), aff'd 558 F.2d 150 (3d Cir.), *cert. denied, sub nom. Beal v. Vecchione*, 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977) (*Vecchione II*); and *Vecchione v. Wohlgemuth*, 80 F.R.D. 32 (E.D.Pa.1978) (*Vecchione III*). We therefore need not detail the facts of the case here. In terms of subject matter, suffice it to say that the *Vecchione* litigation deals with the right of patients confined in Pennsylvania mental health/mental retardation (MH/MR) facilities to control and manage their own property as against: (1) the right of the Commonwealth summarily to seize and control it for the duration of the hospitalization without prior notice or hearing on the issue of the patient's competency to manage that property; and (2) the right of the Commonwealth to appropriate part of the patient's property in satisfaction of the cost of care and maintenance, without prior or subsequent hearing on the correctness of the Commonwealth's assessment.

In terms of result, as the earlier opinions make plain, plaintiff is the prevailing party, for she has won a broad injunctive decree that confers major benefits upon MH/MR patients and affords significant protection for their property. The decree has revolutionized the management of patient funds. Indeed "Vecchione" has become a household word in the Pennsylvania MH/MR field and among Orphan's Court (Estates) practitioners. Recently, the probate section of the Philadelphia Bar Association sponsored a "Vecchione Conference" to train volunteer lawyers to handle guardianship petitions arising under the *Vecchione* decree.

Plaintiffs' right to counsel fees is not really disputed; indeed at the second hearing we held on the fee question, counsel for the Commonwealth conceded as much.[2] Al-

---

1. When the original petitions for counsel fees were filed in this case (in 1975), the Act had not yet become law, and the Supreme Court in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) had rejected the private attorney general doctrine as a ground for awarding counsel fees. Thus fees could be recovered in a case like *Vecchione* only if one of the exceptions to the "American rule," which requires each party to a litigation to pay for the services of his own attorney, were deemed applicable. Those exceptions, as set forth in *Alyeska* are cases in which: (1) a contract or statute grants a right to fees; (2) a party has willfully disobeyed a court order; (3) there is a finding that the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons; or (4) a common benefit has been conferred upon a class by the recovery of a fund or property.

The first brief filed by Community Legal Services (CLS), counsel for Mrs. Vecchione, urged bad faith as a ground for the award of counsel fees. The first brief of David Ferleger, counsel for plaintiff-intervenor, Walter Buress, urged both the bad faith and the common fund doctrines, alleging as to the latter that as a result of the intervention, a monetary benefit

was conferred in the form of some $9.1 million in refunds to class members of money withheld by the defendants after the original *Vecchione* decree had enjoined that practice. The opinion of the Third Circuit in *Skehan v. Board of Trustees of Bloomsburg State College*, 538 F.2d 53 (3d Cir. 1976) makes clear that the common fund exception does not apply in a case where fees are sought from the losing party rather than from the class benefited by the litigation, *i. e.*, from the fund itself. And while we believe a bad faith analysis would permit an award of fees here, we find it unnecessary to support our award on that ground, since the Act provides for a fee award to the prevailing party "[i]n any action . . . to enforce a provision of section . . . 1983." We have, however, considered both the bad faith question and the monetary benefit to plaintiff class in our fee award analysis. See Part III, *infra*.

2. When the fee petitions were first filed, the defendants claimed that the eleventh amendment precluded a fee award in this case. They now concede that *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) has eviscerated that defense. They also argued that because Community Legal Services (CLS)

though the Fee Awards Act leaves to the discretion of the district court the decision whether to award fees, its presumption is that successful counsel should "ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Senate Report No. 94–1011, 94th Cong. 2nd Sess. 2, U.S.Code Cong. & Admin. News 1976, pp. 5908, 5912. This case presents no special circumstances, and none have been suggested, that would render a fee award unjust. The only dispute is as to the amount of recovery. Accordingly, we shall devote this opinion to resolving that question. And while our task is facilitated by the Third Circuit's guidelines for determining an appropriate fee, as first articulated in *Lindy Bros. Builders v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) (*Lindy I*), there are certain aspects of this case that require special attention.

Initially, we must determine whether hours spent on those portions of the case that resulted in the 1974 injunction and declaration and the 1975 consent decree must be excluded from our calculations on the theory that such portions of the case were not pending on the Act's effective date. *See* n. 2, *supra*. Second, we must determine what constitutes reasonable hourly rates for counsel here, who, unlike lawyers in mercantile practice, do not have set rates at which they normally bill clients. And third, we must consider whether, in attempting to arrive at a reasonable fee, we should make an adjustment because of the defendants' alleged bad faith as demonstrated by the failure to implement the 1974 and 1975 *Vecchione* decrees.[3]

With *Lindy I*, the Third Circuit began its attempt to plot with some precision the course to be followed by the district courts in awarding attorneys' fees in appropriate cases. The basic guidelines of *Lindy I* have been further refined in *Lindy II*, 540 F.2d 102 (3d Cir. 1976); *Merola v. Atlantic Richfield Co.*, 493 F.2d 292 (3d Cir. 1974) (*Merola I*) and 515 F.2d 165 (3d Cir. 1975) (*Merola II*); *Prandini v. National Tea Co.*, 557 F.2d 1015 (3d Cir. 1977) (*Prandini I*) and 585 F.2d 47 (3d Cir. 1978) (*Prandini II*); *Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir. 1977), *cert. denied* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); and *Hughes v. Repko*, 578 F.2d 483 (3d Cir. 1978). The latter three cases are particularly relevant here because they deal with statutorily authorized attorneys' fees rather than with awards from a common fund.

*Lindy I* first requires the court to determine the number of compensable hours spent on the case by examining the activities engaged in by counsel and deciding whether the number of hours claimed was reasonably necessary to produce the benefit conferred. In order to place a value on these services, the court must next fix a reasonable hourly rate of compensation for each attorney. The rates may vary according to the nature of the services performed and/or the qualifications, ability and experience of the attorney who performed them. The number of hours multiplied by the rea-

---

already received public funds, the CLS lawyers, who were counsel for Mrs. Vecchione and are co-counsel for the plaintiff class, were not entitled to recover attorneys' fees from the Commonwealth. Apparently, that position too is no longer pressed. It is in any event plainly without merit and antithetical to the purposes of the Fee Awards Act. *Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir. 1977), *cert. denied* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978).

Defendants continue to assert, however, that not all of the hours claimed are compensable. While recognizing that the Act was clearly designed to apply to cases "pending" on its effective date (October 19, 1976), *see Hutto*, 437 U.S. 678, 98 S.Ct. 2565, 2572, n.23, 57 L.Ed.2d 522, defendants contend that since discrete por-

tions of the case had been reduced to final orders via the injunction that issued in July, 1974, and the consent decree approved in April, 1975, those portions were not pending upon the Act's effective date and hours spent litigating them are not compensable. We reject this proposition for reasons appearing in Part II, *infra*.

**3.** While plaintiff's bad faith claim was originally advanced as an alternative basis for the award of fees, *see* n.1, *supra*, in the wake of *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), which makes clear that fees under the Fee Awards Act may be recovered from a state, plaintiffs press bad faith only as a leveraging factor.

sonable hourly rate produces the lodestar figure, which may then be adjusted to reflect the contingent nature of success and quality of the work. In *Merola II*, 515 F.2d at 168-9, the court noted that the quality factor is evidenced by the work observed, the complexity of the issues, and the recovery obtained: "In settled cases [quality] is reflected largely in the benefit produced. It permits the court to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested, or to reduce the objectively determined fee where the benefit produced does not warrant awarding the full value of the time expended."

In addition to the quality and contingency factors, in civil rights cases the district court must also evaluate the reasonableness of the fee "in light of the important substantive purposes" of the Civil Rights Act on which the plaintiff relied. *Hughes v. Repko*, 578 F.2d at 488-89; *see also*, concurring opinions of Judges Rosenn at 490 and Garth at 492.

In fidelity to *Lindy*, we have calculated counsels' fees in two stages. First, we multiplied what we found to be a reasonable number of hours, including hours spent on the early phases of the case, by the various hourly rates that we determined in our discretion to be equal to the prevailing rates in this area for lawyers of similar experience and expertise, working on equally complex litigation. Then we adjusted those figures to reflect the contingency factor, the quality of the work, the bad faith of the Commonwealth defendants in implementing the decrees, and the extent to which this litigation furthered the substantive purposes of the Civil Rights Act, 42 U.S.C. § 1983.

These calculations produce the following fee awards, which we believe will provide reasonable compensation for the services rendered in this case: CLS: $110,641.70 in fees, $2,427.58 in costs; David Ferleger: $86,866.30 in fees, $329.00 in costs; Herbert Newberg: $6,708.00 in fees, $155.00 in costs.

## II. Calculating the Lodestar

### A. Introduction

This litigation was commenced by Community Legal Services (CLS) as counsel for plaintiff, Elvira Vecchione, in January, 1973. In July, 1974, the three-judge court that had been convened to decide the case issued an order enjoining the defendants from continued application of certain state statutes found to be unconstitutional. By early 1975, it was apparent that the defendants were continuing to appropriate the property of patients confined in state mental health facilities pursuant to the offending statutory scheme and in violation of the decree. Thereafter, in February, 1975, David Ferleger, Director of the Mental Patients Civil Liberties Project and an independent practitioner, sought and obtained leave to intervene for his client, Walter Buress. In June, 1975, Herbert Newberg entered an appearance as co-counsel for plaintiff-intervenor Buress. There are thus three separate applications for fees before the Court—those of CLS, of Mr. Ferleger, and of Mr. Newberg.

Five CLS attorneys have worked on the *Vecchione* matter over the years, three of them (Joel Brewer, Jonathan Stein, and Judy Greenwood) acting at various times as lead counsel—or, in the case of Ms. Greenwood, as lead co-counsel with David Ferleger. They seek to recover on behalf of CLS for 1336.14 hours of attorney time, compensated at a rate of $90 per hour for all services.[4] Mr. Ferleger has submitted petitions for an award of fees for 752.73 hours of work at a rate of $70 per hour for time spent prior to August, 1975, and $90 per hour for time spent thereafter. Mr. New-

---

4. The total hours appearing here defer slightly from the figures submitted by CLS and Mr. Ferleger. We have checked and rechecked our calculations and believe our figures set forth the correct total of hours claimed in over ten documents submitted to the Court and that counsel somewhere erred in their addition. In any event our totals differ from that of CLS by less three hours and from that of Mr. Ferleger by less than one hour. Similarly, the totals of costs claimed contained some minor mathematical miscalculations that we have corrected.

berg seeks compensation for 73.9 hours at hourly rates of $100 for services rendered in 1975 and 1976; $135 for services rendered in 1977 and 1978; and $150 for services rendered in 1979. Additionally, Mr. Newberg seeks to recover for 30.6 hours of attorney time spent on the case by his former associate, John C. Gabroy, at a rate of $50 per hour. Finally, counsel seek reimbursement of costs and expenses: CLS—$3,242.06; Mr. Ferleger—$1,218.84; and Mr. Newberg—$221.50.

As is noted above, defendants object to compensating plaintiffs' counsel for hours spent obtaining the 1974 injunction and the 1975 consent decree on the theory that those portions of the case were not pending on the effective date of the Fee Awards Act. They also challenge the number of hours claimed and the hourly rates requested. Observing that both Mr. Ferleger and Judy Greenwood, who logged the bulk of the hours CLS claims, are relatively recent law school graduates, the defendants contend that the hours they spent on the case were excessive due to their inexperience. Pointing to fee awards in other cases in which Mr. Ferleger acted as lead counsel, defendants contend that the rates both he

and Ms. Greenwood request are grossly inflated.[5]

Defendants object to certain specific hours on the ground that they were spent on matters not before the court as issues in this lawsuit. They also object to hours spent litigating issues they did not oppose, on the ground that plaintiffs cannot be said to have "prevailed" on those issues. *Hughes v. Repko*, 578 F.2d at 486–87.

We will discuss these objections *seriatim*.

### B. The Pending Case Question

█ Defendants concede that Congress intended the Fee Awards Act to be applied in cases pending on its effective date, October 19, 1976. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 2572 n.23, 57 L.Ed.2d 522. They argue, however, that because the original *Vecchione* injunction had been issued over two years before the Act became law and the first consent decree was signed over one year theretofore, those portions of the case were not pending for purposes of the statute and hence that hours spent litigating them are not compensable. Stated another way, defendants' argument is that for purposes of attorney compensation, a pending case may comprise both pending and nonpending parts.[6] For this proposi-

---

5. *See e. g. Meisel v. Kremens*, 80 F.R.D. 419 (E.D.Pa.1978) in which Judge Higginbotham awarded Mr. Ferleger $40 per hour for work performed in 1974 and the first six months of 1975 and $60 per hour for work in the second half of 1975, and *Mental Patients Civil Liberties Project v. Hospital Staff Civil Rights Committee*, No. 73–1512 (E.D.Pa. February 2, 1979) in which Judge Newcomer awarded Mr. Ferleger $50 per hour for services rendered from 1973 through 1975.

6. Those courts that have had occasion to determine whether a case was "pending" for purposes of the Fee Awards Act have drawn upon the reasoning of the Supreme Court in *Bradley v. School Board of the City of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). In *Bradley*, counsel sought fees not for all work done since the inception of the case in 1961, but only for time spent in connection with a motion for further relief filed in 1970. In 1971, the district court awarded fees on the alternative grounds of defendants' bad faith and the private attorney general theory. The Fourth Circuit rejected both these rationales for a fee award on the facts of the case and further held that no compensation could be allowed under

the recently enacted fee provisions of the Emergency School Act, 20 U.S.C. § 1617, because there were no pending or appealable orders when the Act became law. The Supreme Court reversed, holding that an award was permissible under § 1617 even though (1) the only unresolved issue in the case was the fee question and (2) § 1617 had not been enacted until after the case had been submitted to the court of appeals. Thus, in *Mental Patients Civil Liberties Project v. Hospital Staff Civil Rights Committee*, 444 F.Supp. 981 (E.D.Pa.1977), Judge Newcomer held a fee award was justified because, even though both the district court and the court of appeals had denied plaintiffs' petition for counsel fees before the Civil Rights Attorney's Fees Awards Act became law, the time for filing a petition for a writ of certiorari to the Supreme Court had not expired by that date. In *Rainey v. Jackson State College*, 551 F.2d 672 (5th Cir. 1977), the court allowed a fee award when the only active issue on the effective date of the Fee Awards Act was the question of attorneys' fees. The *Bradley* rationale was the basis for a holding in *Henry v. Clarksdale Municipal Separate School District*, 579 F.2d 916 (5th Cir. 1978) that *some* issue must

tion they rely on *Wheeler v. Durham City Board of Education*, 585 F.2d 618 (4th Cir. 1978). We think that reliance is misplaced.

*Wheeler* was a school desegregation case in which counsel fees were sought under the counsel fee provisions of the Emergency School Aid Act of 1972, 20 U.S.C. § 1617, or, alternatively, under the Fee Awards Act for services rendered over a period of some sixteen years.[7] The case was filed in 1960 and the initial decision of the district court entered in 1961. Plaintiffs sought further relief in 1962. The decision denying them that relief was reversed on appeal, and an interim desegregation plan was adopted and approved on appeal in 1964, although a purported permanent plan was rejected by the court of appeals in 1965. Finally, in 1966 an acceptable permanent plan was adopted, and the case lay dormant for about three years, until, as a result of two intervening Supreme Court decisions, plaintiffs once again sought and were granted further relief in 1969 and 1970.

No appeal was taken from these orders and the case once again became inactive until July, 1972, when plaintiffs filed yet another motion for further relief. In 1975, the Fourth Circuit agreed that the 1970 plan was inadequate to accomplish a unitary school system. Subsequently, a plan satisfactory to all parties was adopted. It was at this point that counsel applied for fees for services rendered over the entire course of the litigation.

The district court refused to award compensation for any time spent prior to July 1, 1972, the effective date of the Emergency School Aid Act, on the grounds that (1) as of that date the issue of plaintiffs' entitlement to attorneys' fees was not pending before the court and (2) to award fees for hours spent back to back to 1960 would be unjust, since defendants could not have foreseen their potential liability for attorneys' fees and had made a good faith effort throughout to comply with the applicable law.

The Fourth Circuit affirmed in part and reversed in part and remanded.[8] Reasoning that a pending case is one that has not been reduced to final judgment, and drawing upon the Supreme Court's definition of final judgment in *Bradley v. School Board of the City of Richmond*, 416 U.S. 696, 711 n. 14, 94 S.Ct. 2006, 2016, n. 14, 40 L.Ed.2d 476 (1974) (a final judgment is one where " 'the availability of appeal' has been exhausted or has lapsed, and the time to petition for certiorari has passed."), the court determined that since several final orders purporting to decide the rights of the parties had issued before the effective date of the Emergency School Aid Act, time spent litigating the issues resolved by those orders was not compensable. When the Act became law, there were no issues awaiting determination by the court, and the case "was pending only in the technical sense that jurisdiction to enter such further orders as were necessary and desirable had

have been actively pending in the district court or on appeal when § 1617 of the Emergency School Aid Act became law in order to support an award of fees for services performed before the Act's effective date. In *Clarkson* where there were no active issues before the court when § 1617 was enacted, counsels' subsequent successful motion was held insufficient to render defendants liable for counsel fees for work performed over the entire course of the litigation. It is not clear from *Clarkson* whether, had there been one unsettled phase of the case at the time the act became law, the court would have permitted fees for phases of the case that were closed for purposes of appeal.

While *Bradley* and its progeny are helpful insofar as they attempt to define a "pending case," they do little to advance our analysis of defendants' argument that a single case may be separated into pending (compensable) and nonpending (noncompensable) parts.

7. Although addressing themselves solely to interpretation of the Emergency School Aid Act, the court observed that its reasoning applied equally to awards sought under the Fee Awards Act. *Id.* at 621.

8. The court determined that it would be permissible to allow compensation for time spent on the motion for further relief filed in late July, 1972, even if the time was logged prior to the effective date of § 1617 (July 1, 1972). The case was therefore remanded for a determination of whether any such pre-act time was in fact spent and for a reconsideration of the question of costs.

been retained. There was no certainty, however, that the jurisdiction of the court would ever again be exercised. Indeed the litigation might have remained inactive for years." 585 F.2d at 623.

Several features distinguish *Vecchione* from *Wheeler*. First, and perhaps most important in terms of the *Wheeler* rationale, is that when the Fee Awards Act became law the very issue of attorneys' fees was pending before us (motions having been filed a year previously) as were several motions to hold defendants in contempt. Furthermore, only one week prior to the Act's effective date, we had denied defendants' motion to vacate and/or modify the April, 1975, consent decree, a motion that not only called the consent decree into question but indeed challenged our jurisdiction to have entered the original injunction. Our denial of the motion was subsequently appealed to the Third Circuit, and, because defendants continued to press their jurisdictional challenge (while nevertheless stating that they were not seeking to attack the 1974 order), the vitality of all of our prior rulings was essentially before the court of appeals subsequent to the effective date of the Fee Awards Act. This fact was recognized both by us and by the court of appeals in *Vecchione II*, 426 F.Supp. at 1304, and 558 F.2d at 159. While defendants attempt to relitigate a two year old decree was rejected, under the circumstances we find somewhat disingenuous their present argument that, when the Fee Awards Act became law, the injunction and consent decree were nonpending final orders.

Second, while the district court in *Wheeler* noted that defendants could not have foreseen their potential liability for counsel fees prior to passage of the Emergency School Aid Act, defendants here should have been aware of the possibility that fees would be awarded on a bad faith theory since they failed to attempt even threshold implementation of the 1974 injunction and resisted compliance in the face of numerous motions for contempt until the Supreme Court denied certiorari in *Vecchione II* in 1977. Indeed, plaintiffs' counsel had urged bad faith as the basis for a fee award in 1975. *See* n. 1 *supra*.

Counsels' periodic return to the district court in *Wheeler* was occasioned by the failure of the remedies granted to provide the relief sought and by modifications in the law governing school desegregation cases. Here, by way of contrast, counsel were forced to return to court because of defendants' failure to comply with the directives of the court. Since the original *Vecchione* decree issued, there has been no modification of the applicable legal principles that would necessitate a change in the relief granted. Rather, our continued involvement was made necessary only because the defendants sought time and again to avoid the effects of rulings made against them. From its inception *Vecchione* has not been characterized by the "long periods of repose" found in *Wheeler*, nor have we retained jurisdiction only in a "technical sense" to enter such further orders as are necessary and desirable. While it is true that in 1974 we elected not to issue an affirmative decree but rather to leave implementation to the parties, once it became obvious that defendants were not going to comply with the terms of the injunction, this case became and has remained one of the most active on our docket.

Thus, we think *Vecchione* is readily distinguishable from *Wheeler*, a case that spanned many more years, went through several long periods of inactivity following the entry of judgments purporting to finally decide the rights of the parties, saw numerous changes in the applicable law, was characterized by good faith on the part of the defendants, and was a case in which no issues were pending resolution by the court when fee awards became statutorily authorized.

We think it important to note once again the premise underlying the Fee Act—that fees are to be awarded a prevailing plaintiff "unless special circumstances would render such an award unjust." Senate Report No. 94–1011, 94th Cong. 2nd Sess. 2, U.S.Code Cong. & Admin.News, p. 5912. Given this premise, we are faced with the

question whether, under the facts of *Vecchione*, it would be logical to divide attorney hours into distinct segments, awarding compensation for some but not for others, even though all hours were logged in the same litigation and in furtherance of the same end. We think that it would not and that no special circumstances exist here to render unjust an award that includes compensation for time spent on the original *Vecchione* decrees. Indeed, we believe a manifest injustice would result from a denial of compensation for that time.

Finally, we are constrained to say that even if we were to hold that the original decree (or the 1975 consent decree) was a final judgment in the sense that *Bradley* uses the term and that those parts of the case were thus not "pending" for purposes of the Fee Awards Act, we would nevertheless award fees for time spent on those facets of the case on the theory that defendants bad faith in complying with their terms permit such an award. *See* discussion *infra*. *See also, Alyeska, supra*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Universal Oil Products v. Root Refining Co.*, 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed.2d 1447 (1946).

### C. Reasonable Hours and Hourly Rates

The defendants have objected to both the number of hours claimed and the hourly rates sought. Plaintiffs counter that many hours actually spent have not been included in their fee applications and that they are entitled to what is, at least for some of them, the admittedly high rate of $90 per hour because in *Vecchione* they undertook responsibilities equivalent to those undertaken by more senior lawyers in commercial practice in equally complex litigation.

In order to assess the validity of each position, we have subjected plaintiffs' counsels' claims and the objections thereto to intense scrutiny and have also looked to recent fee awards in cases of a similar type and/or complexity. *Rodriguez v. Taylor*, 569 F.2d at 1250. Our review has convinced us that while there is merit to the arguments of the respective parties, neither side is wholly correct in its assessment of what would be a proper fee in this case.

### 1. Hours

We turn first to the question of the reasonableness of the hours claimed. While neither the CLS attorneys nor David Ferleger kept contemporaneous time records at the outset of their involvement in *Vecchione*, they have attempted to reconstruct the hours devoted to the case. We find, with certain exceptions noted below, that the reconstructions meet the mandates of *Lindy II*, 540 F.2d at 109. (Mere estimates of time will not suffice, but a reconstruction of hours spent may support a fee award so long as the reconstruction is substantial and reasonably accurate and the hours claimed were actually spent.)

That determination does not end our task, however, for we are required by *Hughes v. Repko*, 578 F.2d at 487 to give credit only for the hours reasonably supportive of claims successfully pursued against the party from whom fees are sought: "The burden of persuasion must rest on the petitioner to demonstrate to the court the number of hours attributable to the successful claim, and also to demonstrate that the number of hours so attributable was reasonably necessary to perform the work at issue."

While objecting to specific hours claimed as noncompensable or unnecessary, defendants have also raised a general objection that the number of hours is inflated due to counsels' inexperience and/or inefficiency. We must thus ascertain whether the hours spent were reasonably necessary to produce the benefit conferred.

Given the truly staggering amount of negotiation and coordination this case required, we find the time spent by plaintiff's counsel to have been reasonable. We note that while the number of hours claimed are many, most of them were made necessary by the failure of the defendants to implement the *Vecchione* decrees and by the fact that the chemistry of the case required negotiation of virtually every clause of the final agreement. We speak with some au-

thority on this latter point as we observed (and participated in) many of the sentence by sentence negotiations. The difficulty with which the stipulation was accomplished is described at some length in *Vecchione III*, 80 F.R.D. 32. Here we note only that the agreement is a 28 page tripartite document providing for the complete overhaul of the procedures governing money management of patients confined in state MH/MR institutions.

While an attorney with more years in the profession might have spent somewhat less time working on certain major briefs and memoranda or perhaps in negotiations (though it is doubtful that such an attorney would have as much expertise in the law affecting mental health as plaintiffs' counsel), we think it would be difficult and probably arbitrary to determine how many hours spent on any given project might be subtracted for "inexperience." [9] We note the mandate that district courts "may not reduce an award by a particular percentage or amount (albeit for justifiable reasons) in an arbitrary or indiscriminate fashion." *Prandini II*, 585 F.2d at 52. *See Hughes v. Repko*, 578 F.2d at 486 (an automatic percentage reduction of the lodestar is "legally impermissible"). We think that to the extent that the inexperience of certain counsel may be reflected in the hours spent (and we offer no view thereon in light of our overall determination that the hours were reasonable), an adjustment has been made through the hourly rate we have awarded.[10]

With these general precepts in mind, we turn to a consideration of the fee petitions of each attorney and to specific objections raised by the defendants.

*CLS*

*Joel A. Brewer*

Mr. Brewer was the CLS attorney who initiated this lawsuit. According to the fee petitions he spent 369.5 hours on the case over a period of approximately two years. In answer to interrogatories propounded by defendants, he stated that he had reconstructed the number of hours he spent "based generally on my own recollection of events and based on the assessment of the usual amount of time I spent on matters of similar length, purpose, and complexity." Answer to Interrogatory No. 17.

Like defendants, we are troubled by this statement, for while on the one hand we have no doubt that Mr. Brewer did spend a considerable amount of time on this case and that a relatively large number of hours could have been devoted without extending into the realm of unreasonableness, we believe this reconstruction comes closer to a mere estimate than to the substantial reconstruction envisioned by *Lindy II*. Yet we also believe it would be unjust to refuse to award any compensation for Mr. Brewer's labor on behalf of plaintiffs, since at the time the litigation was commenced, fee awards to publicly funded legal services organizations were not common, and CLS had little reason to keep contemporaneous time records.

Nevertheless, we find that the hours claimed by Mr. Brewer are in some specific instances excessive. We note that at the time he worked on *Vecchione*, Mr. Brewer was an experienced attorney. Furthermore, as noted below, much of the work required here was similar to work done by Mr. Brewer on other cases, so that, for example, unlike Ms. Greenwood (at least in her initial efforts), Mr. Brewer brought a certain amount of expertise to bear in *Vecchione*.

Of the 369.5 hours he claims, Mr. Brewer spent 252 preparing the following major documents: Complaint (40 hours); memo-

---

**9.** Unlike *Herrington v. Abington School District*, No. 77–1473 (E.D.Pa. May 30, 1979), this is not a case where the hours claimed are excessive on their face. In *Herrington*, Judge Fullam was forced to conclude that, given the work product, the time claimed was so great as "to render inescapable the conclusion either that necessary work took much more time than it should have or that a great deal of time was spent pursuing nonmeritorious lines of inquiry." Slip op. at 2–3.

**10.** Defendants have objected to the hours claimed as excessive for "attorneys charging $90 per hour."

randum in support of motion for a temporary restraining order, three-judge court, and class action (100 hours); supplemental memorandum on same and in opposition to defendants' motion to dismiss (16 hours); brief in support of motion for summary judgment (80 hours); proposed consent decree (16 hours).

We have disallowed the following hours: 50 of the 100 claimed for the memorandum in support of a T.R.O. Despite the fact that this document was somewhat lengthy, the legal arguments it required were not particularly complex. Furthermore, in preparing the memo Mr. Brewer used briefs filed in other cases. Answer to Interrogatory No. 19.

Similarly, we have eliminated 30 hours of the 80 claimed for preparing the 35 page brief in support of the motion for summary judgment. Because a large portion of this brief was devoted to a recapitulation of other material, we find the time spent to have been excessive. Here too Mr. Brewer utilized a brief filed in another case.

We will allow compensation in full for the hours spent preparing other documents identified above, for these hours appear to us to be reasonable.

We have eliminated an additional 8 hours for time spent on tasks that could have been delegated to nonprofessional personnel. *Prandini I*, 557 F.2d at 1020; *In re Hardwick & Magee Co.*, 355 F.Supp. 58, 74 (E.D.Pa.1973). These include 4 hours for delivery of the motion for leave to proceed in forma pauperis, "talking to the judge's clerk, and waiting for the judge to sign"; and 4 hours for collating, mailing, and delivering the motion for a three-judge court.

Finally, we have disallowed 4 of the 8 hours claimed in 1974 for composing a letter to the Court as simply excessive.

Thus, we will allow CLS to recover for 277.5 hours of time spent by Mr. Brewer.

### Jonathan Stein

Mr. Stein claims to have spent 64.75 hours on the *Vecchione* matter. We find these hours to be reasonable except for 11 hours spent on the complaint, motion for a T.R.O. and the brief in support of plaintiff's motion for summary judgment. While we appreciate that more than one attorney can profitably work on the same project, in view of the large number of hours logged by Mr. Brewer on these matters, we find that absent an adequate explanation of just what Mr. Stein contributed (and there has been none), the few hours spent by him were unnecessary and probably duplicative.

We will therefore permit compensation for 53.75 hours.

### Douglas Dye

Mr. Dye has claimed only 18 hours spent in connection with this case. With the exception of two hours spent on the supplemental memo in support of a T.R.O. (which we do not accept for the same reasons outlined above in our discussion Jonathan Stein's hours) we find these to be reasonable.

### Elliot Platt

Like Mr. Dye, Elliot Platt logged few hours in *Vecchione*. We find the 22 hours he claims to have been reasonably spent and will allow compensation for them.

### Judy Greenwood

Ms. Greenwood seeks compensation for 861.89 hours. Of the CLS lawyers who worked on *Vecchione*, she was the most junior, having begun work on it almost immediately upon graduation from law school. While we find the hours spent by Ms. Greenwood were for the most part reasonable, we have disallowed certain hours for specific reasons outlined below.

Of the 68.08 hours Ms. Greenwood devoted to *Vecchione* in 1975, we have disallowed 8 for "responding to complaints state-wide from July through October." Without greater specificity, it is impossible for us to judge whether these hours were reasonably spent or not.

Of the 333.5 hours claimed in 1976, we refuse to permit compensation for 17 as follows: 3 hours spent researching the issue of whether a single judge has the power to rule on a contempt motion as duplicative of 7 hours spent by Mr. Ferleger researching and writing on the same topic; 7 hours

claimed for "phone communications with attorneys state-wide September–November, 1976," and 7 hours claimed for "Phone Communications, Record Review and Interviews with Intervening Plaintiff Applicants" as mere estimates lacking the degree of specificity *Lindy* requires. *See also In the Matter of Mead Land and Development Co., Inc.,* 577 F.2d 858 (3d Cir. 1978).

Of the 267.9 hours claimed for 1977, we have also disallowed 17 hours. These comprise 6 hours for a meeting with State Senator Louis Coppersmith, which related to plaintiff's attempt to establish an independent office of the Guardian outside the Department of Public Welfare. As noted in *Vecchione III,* 80 F.R.D. at 39, efforts to this end were unsuccessful. Moreover, it was obvious from the outset, and we so informed counsel, that such efforts would be futile. We therefore do not believe CLS should be compensated for time so spent. *Cf. Hughes v. Repko, supra,* 578 F.2d at 486–87. (Hours spent litigating claims on which plaintiffs did not prevail held not compensable.) We have also disallowed .5 hours for filing the motion for a T.R.O., a task that could have been delegated to a nonprofessional; 8 hours of 16 claimed for "depositions and drafting of contempt motion and supporting memorandum of law" —these depositions are not identified, though elsewhere in the fee petition the time spent preparing for and taking depositions of particular persons is detailed; and 2.5 hours for preparing a "petition under All Writs Act to Third Circuit," a petition that appears never to have been filed.

 Ms. Greenwood seeks fees on behalf of CLS for 133.58 hours of work in 1978. Of these, we have disallowed 17.75 hours spent preparing plaintiffs' brief in support of the settlement, which was devoted largely to opposing the Rule 60(b) motions filed by the Pennsylvania Association of Retarded Citizens (PARC) and the various objections to the settlement raised by other nonparties to the lawsuit. At this point defendants and plaintiffs had resolved their differences and were united in their desire for approval of the settlement. Thus,

plaintiffs cannot be said to have prevailed as against defendants when the settlement was approved, and counsel cannot be compensated for time spent advocating their jointly held position. *Cf. Baughman v. Wilson Motor Freight Forwarding Co.,* 583 F.2d 1208, 1214 (3d Cir. 1978) (defendant not required to compensate plaintiff for attorney hours devoted to the case against other defendants who settle or are found not liable); *Hughes v. Repko,* 578 F.2d at 486–87. Similarly, we have disallowed 1 additional hour claimed for communications with PARC prior to our hearing on the settlement.

We decline to award fees for 13 hours spent preparing the *Vecchione* "*cy pres*" proposal designed to provide counsel in guardianship hearings. *See Vecchione III,* 80 F.R.D. at 45–46. While it is true that this proposal was prepared at the behest of the Court, we view counsels' efforts in this regard as falling more properly under their general public interest charter than under the rubric of *Vecchione* implementation. The proposal was never adopted and the guardianship advocacy problem is ongoing. We therefore feel that compensation for time spent on the proposal is not justified here. Similarly, of the 62.83 hours claimed for 1979, we have disallowed 6.5 hours devoted to the "*cy pres*" proposal.

In her final memorandum of costs and disbursements, Ms. Greenwood has claimed 43.33 hours for correspondence, review of implementation reports, and consultation with class members over the year from May, 1978, to May, 1979. In response to defendants' objection to this very generally termed estimate, Ms. Greenwood attempted to be more specific, noting that this time includes correspondence with state court judges about guardianship hearings, letters about the "*cy pres*" proposal, responding to class inquiries and complaints, and corresponding with defendants' attorney, Robert Hoffman. While we appreciate counsel's attempt to be more specific, we note that at least some items fall within categories we have disallowed. We will therefore permit recovery for one-half of the time claimed or 21.66 hours.

Finally, we must consider the hours spent litigating the issue of attorneys' fees. While *Prandini II*, 585 F.2d at 53, specifically authorizes compensation for hours so spent when fees are sought under statutory authority rather than from a common fund, we believe that attorneys should nevertheless exercise considerable restraint in the logging of such hours. CLS has sought compensation for 139.83 attorney hours (135.83 spent by Ms. Greenwood) on the fee issue. We think that this total, particularly when added to the 87.5 hours Mr. Newberg claims to have spent on the question of fees, is excessive and unreasonable. While we believe that in litigating the substantive issues in the case, counsel were largely successful in avoiding duplication of effort, we find that they were not similarly successful when it came to the question of their fees, for each facet of the issue—bad faith, the pre-*Hutto* eleventh amendment question, the Fee Awards Act, the pending case problem—generated at least two briefs, one from CLS and one from Mr. Newberg. We think that counsel could and should have avoided such overkill and that they should not be compensated in full for the hours they claim. We will therefore permit CLS to recover for 68 hours of attorney time spent by Ms. Greenwood on the fee issue, one-half of the total she logged.

Thus CLS will be compensated for a total of 692.15 hours of attorney time spent by Judy Greenwood.[11]

*David Ferleger*

Mr. Ferleger moved to intervene on behalf of Walter Buress in February, 1975. His intervention was occasioned by defendants' failure to abide by the terms of the July, 1974, injunction issued by the three-judge court. Mr. Ferleger seeks compensation for 752.73 hours spent on this case from February, 1975, through May, 1979.

Like the CLS attorneys, Mr. Ferleger did not keep contemporaneous time records during the early stages of his involvement in the case.[12] He has nevertheless painstakingly reconstructed the hours spent, and we are satisfied for the most part that the reconstruction meets the *Lindy II* requirements and that the hours claimed were reasonably spent.

Mr. Ferleger seeks compensation for 101 hours spent in 1975. As to these hours defendants have raised only their general inexperience objection, which we have discussed (and dismissed) *supra* at 784. We have disallowed, however, 6 hours claimed for "miscellaneous conversations and correspondence among counsel," as a mere estimate.

Of the 108.25 hours claimed for 1976 we have disallowed 37—12 for "correspondence" and 25 for "telephone conversations," again because we feel these descriptions are entirely too vague to support a fee

11. We have considered and rejected other objections raised by defendants to the hours claimed here. For example, defendants object to the fact that both Ms. Greenwood and Mr. Platt seek compensation for hours spent taking depositions on May 18, 1977. At the second hearing we held on the question of fees, Mr. Platt testified that both he and Ms. Greenwood participated in the depositions. While it is, in our view, preferable to limit the number of attorneys attending depositions, it is common practice to have two attorneys present, particularly where the session is a lengthy one and involves a number of witnesses. Here, four depositions were taken over the course of an entire day. Under the circumstances, we do not find the presence and participation of two attorneys improper and will permit compensation for the hours claimed by each of them.

Defendants have also objected to all of the hours devoted to the problems and complaints

of individual class members. We think such time was properly spent under the rubric of implementation and is compensable. Many such hours were spent at our request, responding to communications about *Vecchione* implementation which had been addressed to the court.

Finally, defendants have noted differences in the hours claimed for certain conferences attended by more than one attorney seeking compensation here. It is clear that in some cases counsel have sought to recover for travel time and in other cases have not. Since travel time is compensable, *Imprisoned Citizens Union v. Shapp*, 473 F.Supp. 1017 (E.D.Pa.1979), we see no reason to attempt to reconcile the time claimed where the difference in compensation would be minimal.

12. Hours spent from approximately March 1, 1977 on are supported by documentation.

award. Of the 384.05 hours claimed for 1977 we refuse to permit compensation for 26.4 hours devoted to unspecified correspondence [13] and 4 hours for meeting and corresponding with Senator Coppersmith for the reasons discussed *supra* at 785. We have also disallowed 3 hours spent on the question of attorneys' fees. (*See infra.*)

Mr. Ferleger seeks to recover for 91.13 hours of attorney time spent in 1978. We have disallowed 47.2 hours comprising the following: 5.75 hours devoted to the PARC objections to the settlement, *see supra* at 786; .3 hours spent examining correspondence among Judy Greenwood, Robert Hoffman and a Mr. Perry regarding a representative payee and client of Ms. Greenwood, who was not a class member (unnecessary and duplicative); 9.65 hours spent on matters relating to the question of attorneys' fees (since Herbert Newberg was acting as Mr. Ferleger's counsel on the fee issue, Mr. Ferleger's involvement in that aspect of the case was unnecessary); and 31.5 hours spent on the "*cy pres*" proposal (*see supra* at 21–22).

Of the 68.3 hours claimed in 1979, we have disallowed 7 hours as follows: .5 hours spent on the fee question; 3 hours spent studying a brief filed in the Pennsylvania Superior Court dealing with guardian hearings and appeals; and 3.5 hours spent on the "*cy pres*" proposal.

In summary, we will allow Mr. Ferleger to recover for 622.13 hours of time as reasonably devoted to this case.

### Herbert Newberg

Defendants argue that Mr. Newberg should be compensated only for hours spent on the question of Mr. Ferleger's fees and not for time spent on substantive issues in the case.[14] Their support for this proposition is Mr. Newberg's affidavit, filed April 3, 1978, which states that he was asked by Mr. Ferleger "to serve as co-counsel to assist him in the class action and settlement aspects of the case, in addition to the fee award." Defendants reason that Mr. Newberg was not retained as an attorney by a plaintiff in the case, but rather was acting on a referral basis. Why it then follows that Mr. Newberg is precluded from recovering for time spent furthering plaintiff's cause is not clear to us, and defendants have cited no authority for their proposition. The Third Circuit implicitly permitted recovery in a similar situation in *Prandini I, supra,* 557 F.2d at 1019, where an attorney seeking fees entered at the behest of other counsel. The court observed, "Having been identified as a lawyer who represented the plaintiff and who had requested compensation, [counsel's] fee should have been determined by the same standards applicable to the others . . . ." *See also, Commonwealth of Pennsylvania v. O'Neill,* 431 F.Supp. 700 (E.D.Pa.1977) *aff'd,* 573 F.2d 1301 (3d Cir. 1978).

Mr. Newberg entered an appearance as counsel, not for David Ferleger, but for plaintiff-intervenor in June, 1975. That he spent most of his hours on the fee question strikes us as of no moment so long as *all* of the hours he claims were reasonably spent.

As noted in our discussion of Ms. Greenwood's hours, we have found counsels' efforts on the fee question to have been unnecessarily duplicative and will therefore permit Mr. Newberg to be compensated for only one-half of the total hours claimed (or 28.5 hours of Mr. Newberg's time and 15.3 hours of the time logged by his associate, John C. Gabroy). Additionally, Mr. New-

---

13. These hours were spent in the first half of 1977. Mr. Ferleger has also claimed 35 hours for miscellaneous correspondence and telephone conversations occurring in the second half of 1977. Although counsel for defendants have objected to these hours on vagueness grounds, we note that the hours are supported by contemporaneous time records. Since Mr. Ferleger made these records available to defendants and since defendants, who have been most assiduous in detailing their objections to specific items claimed in each attorney's fee petitions, have not objected to particular items, we will permit recovery for those hours.

14. Originally, defendants maintained that no compensation could be given for time spent litigating the question of fees. Since *Prandini II,* 585 F.2d at 53 rejected that position, defendants have withdrawn their argument.

berg may recover for the 17 hours he spent on the substantive issues in the case.[15]

We will therefore permit recovery for 60.8 hours claimed by Messrs. Newberg and Gabroy.

## 2. *Hourly Rates*

In *Rodriguez v. Taylor,* 569 F.2d 1231 (3d Cir. 1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978), the Third Circuit addressed the issue of what rates will permit reasonable compensation for attorneys, who, because of the nature of their practices, do not have set rates at which they normally bill clients. Although *Rodriguez* involved a fee award made pursuant to the mandatory provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 626(b), it is clear that its rationale applies equally to fee awards made under other statutes. Indeed, in articulating the standards district courts should apply, the *Rodriguez* court drew heavily on the legislative history of the Fee Awards Act, quoting the Senate Report that accompanied the bill into law: "It is intended that the amount of fees awarded under S.2278 be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature." Senate Report No. 94–1011, 94th Cong., 2d Sess., 6, reprinted in [1976] U.S.Code Cong. & Admin.News, p. 5913.

*Rodriquez* makes plain that attorneys who are employed by legal services organizations are not to receive lower fees than their similarly experienced colleagues in commercial practice simply because of the public interest nature of their work or because their salaries are lower than those of attorneys in private practice. Rather ". . . district court judges should look to cases of similar complexity, in particular other employment discrimination and related civil rights suits, to determine reasonable hourly rates for counsel who do not have normal private practice billing rates." *Id.* at 1250. *See also, Mid Hudson Legal Services v. G. & U., Inc.,* 465 F.Supp. 261 (S.D.N.Y.1978).[16]

Thus, in determining a reasonable rate for each attorney here seeking fees, we have looked to recent fee awards made in.

---

**15.** While we find the hours Mr. Newberg spent on the case in chief to be reasonable and therefore compensable, we do not believe that Mr. Newberg's lodestar for hours so spent should be increased under the *Lindy* and *Hughes* analyses. Although we have concluded that an increase in the lodestars of CLS and Mr. Ferleger is appropriate, *see* discussion *infra* Part III, the considerations that led us to that determination are simply not present in the case of Mr. Newberg. As the defendants have pointed out, Mr. Newberg's role in this litigation was largely a consultative one, and unlike the CLS attorneys and Mr. Ferleger, he played no part in the negotiations that led to the stipulation between counsel that we have termed "the signal benefit of *Vecchione.*" Part III, *infra* at 796. We therefore believe that an increase in Mr. Newberg's lodestar would result in an excessive fee and that recovery based on the lodestar figure alone will amply compensate Mr. Newberg for his efforts on behalf of the *Vecchione* class members.

**16.** Largely in response to *Rodriguez,* in September, 1978, CLS adopted a suggested fee schedule, which attempts to place a market value on the services of its attorneys based on years of experience. The schedule has been submitted to us as an alternative method of setting hourly rates for the attorneys who worked on *Vecchione.* We have considered it and the testimony concerning its preparation taken before Judge McGlynn in *Fernandez v. Shapp,* No. 74–2959 on March 13, 1979. Although we have found the fee schedule of interest, we have some doubts about the extent to which it reflects a disinterested view of the prevailing rates currently being charged in Philadelphia. Unlike rate schedules prepared by law firms in commercial practice, it will never actually be used (unless it is followed by judges who have occasion to award CLS fees), and thus it is not subject to the market pressures that ordinarily bear upon attorney rates. We have therefore accorded it little weight.

In May, 1978, Mr. Ferleger testified before this Court that in his private practice he had established the following rates for noncontingent legal services: $90 per hour for work involving mental health law or other civil rights areas in which he has some expertise; $50 per hour for general office work in other legal areas not involving litigation; $250 per hour for commitment hearings. Of course, these rates are not binding on us should we determine they are unreasonable in the context of this case.

this circuit, including, but not limited to, civil rights cases, and have drawn upon our knowledge of the current and historical rates for legal services in the Philadelphia area.[17]

Our review of the facts and of the cases has convinced us that defendants are correct in their argument that, given the relative experience and expertise of the various counsel seeking fees and even in light of the labyrinthine posture *Vecchione* eventually assumed, an across-the-board award of $90 per hour would be excessive (although we have allowed that rate for certain of the hours spent by certain counsel). As we have noted elsewhere in this opinion, Ms. Greenwood was a novice and Mr. Ferleger had been practicing but a few years when they began work on this case. And while counsel here assumed roles in the litigation that might appear to be equivalent to those normally undertaken by more senior attorneys, we do not believe that this fact alone entitles them to an hourly rate equal to that of lawyers with many more years of experience, although we have considered those roles in arriving at what we believe to be reasonable hourly rates.

The rates we have settled upon are what have been termed "historical" rates, *i. e.*, rates that would have been reasonable at the time the services were in fact rendered had they been charged by counsel with the experience and expertise these counsel then possessed. We are aware that in order to compensate counsel for the loss they would otherwise experience because of inflation, in cases where counsel seek fees for all services performed in a protracted litigation, some courts have awarded "current" (*i. e.*, present billing rates) rather than "historical" rates. *See e. g. In Re Ampicillin Antitrust Litigation*, 81 F.R.D. 395 (D.D.C. 1978) and cases cited therein.[18] Since that approach has never been specifically autho-

rized by the Third Circuit and since *Lindy II*, 540 F.2d at 117, expressly permits an adjustment in the lodestar under the rubric of contingency to account for the delay in receipt of payment, we believe the better method is to compute the award on the basis of historical rates. This approach was taken by Judge Van Artsdalen in *AAMCO Automatic Transmissions, Inc. v. Tayloe*, 82 F.R.D. 405 (E.D.Pa.1979) and seems to us a sound one.

Additionally, we have adopted the approach of Chief Judge Lord in *Imprisoned Citizens Union v. Shapp*, 473 F.Supp. 1017 (E.D.Pa.1979), which allows for periodic increases in each attorney's rate, "that method being the more exact scheme of compensation," rather than the approach of those cases that use only one rate for the entire period of recovery, be it "current" or "historical." We believe the incremental approach is sound in that it recognizes the increase in an attorney's market worth that accompanies his or her increasing expertise.

We have declined to follow defendants' suggestion that we base our rates on those found reasonable in *Commonwealth of Pennsylvania v. O'Neill*, 431 F.Supp. 700 (E.D.Pa.1977), *aff'd.* 573 F.2d 1301 (3d Cir. 1978), a long and complex litigation challenging the hiring and promotional practices of the Philadelphia Police Department. In *O'Neill*, Judge Fullam awarded Robert Reinstein, then a full professor of law at Temple University, $40 per hour and various members of the firm of Drinker, Biddle and Reath two-thirds of their normal hourly rates. Although *O'Neill* was relied upon as a source for reasonable hourly rates by both Judge Higginbotham in *Meisel v. Kremens*, 80 F.R.D. 419 (E.D.Pa.1978) and Judge Van Artsdalen in *White v. Beal*, 447 F.Supp. 788 (E.D.Pa.1978), we do not believe that it provides strong precedent, for the rates awarded were simply the rates sought by

---

17. "A judge is presumed knowledgeable as to the fees charged by attorneys . . . ." *Lindy I, supra*, 487 F.2d at 169.

18. Courts have also awarded current rates without comment as to the reasons for that choice. *See, e. g., Miller v. Fisco*, Fed.Sec.L. Rep. ¶ 96,348 (E.D.Pa.1978).

counsel. *O'Neill* does not suggest that had counsel sought to recover their normal billing rates, the resulting fee would have been unreasonable. While counsels' requests were surely laudable, they do not strike us as examples that need be followed in every case. Indeed, the language of *Rodriguez*, which states that rates shall be set with reference to cases of similar complexity, suggests that an *automatic* reduction by one-third of what is otherwise a reasonable rate would be erroneous.

We have determined that the lodestars in this case should be computed at the rates that follow:

*CLS*

### Joel A. Brewer

At the time Mr. Brewer initiated this action, he was Managing Director of the CLS Law Center in Germantown and had been practicing law for about four years, a period of time comparable to that of an experienced associate at a private law firm. We find the reasonable hourly rates for his services to be $55 for work performed in 1973; $60 for work in 1974; and $70 for work in 1975.

### Jonathan Stein

Mr. Stein graduated from law school in 1967. He worked on *Vecchione* sporadically over a four year period, during which time he was Chief of Law Reform at CLS in Philadelphia. We have determined that the following hourly rates are reasonable for Mr. Stein's services: $70 for 1973; $80 for 1975. We further find that the $90 requested for work done in 1976 and 1977 is reasonable.

### Douglas Dye

Mr. Dye was an attorney with five years experience when he worked on *Vecchione.* For his services in 1973 we will allow an hourly rate of $60.

### Elliot Platt

The most senior of the CLS attorneys seeking fees here, Mr. Platt has been Chief of Litigation since 1972 and is supervisor of the Prison-Mental Health Unit. The requested rate of $90 is reasonable for the legal work he did on *Vecchione.*

### Judy Greenwood

Ms. Greenwood is a CLS staff attorney. As noted above, she began work on *Vecchione* shortly after graduation from law school. We will award the following hourly rates: 1975—$40; 1976—$45; 1977—$50; 1978—$60; 1979—$70. Because she assumed a major role in this litigation while still an extremely young attorney and in recognition of her growing expertise in the field of mental health law, we have given her a somewhat higher hourly rate than we otherwise would have for services rendered in 1978 and 1979. As to the hours she spent on the fee petitions, since we have reduced the total number of hours claimed by one-half because of unnecessary duplication of effort, we will permit Ms. Greenwood to recover at a rate of $53 per hour, the average of the annual rates we have determined will provide reasonable compensation for her work.

### David Ferleger

Mr. Ferleger became involved in *Vecchione* only three years after beginning the practice of law. However, in those three years he had already established himself as an expert in the field of mental health litigation. While still a law student, Mr. Ferleger worked on numerous projects in law, medicine, and psychiatry, and immediately upon graduation established the Mental Patients Civil Liberties Foundation of Pennsylvania. Now in private practice, he has been the moving force in much of the major mental health litigation that has occurred in Pennsylvania in the last several years.

In light of Mr. Ferleger's expertise we have accorded him somewhat higher annual rates than we would award a less expert peer as well as somewhat greater annual increases in his rate of compensation: 1975—$55; 1976—$65; 1977—$70; 1978—$80; 1979—$90.

*Herbert Newberg*

Mr. Newberg is a recognized expert on class action and civil rights litigation. As the author of *Newberg on Class Actions*, his scholarship has made him a highly respected member of the bar. Defendants have not objected to the hourly rates he seeks, and we find them to be reasonable. He will therefore be compensated for his work in 1977 and 1978 on the substantive issues in the case at his historical rate of $135 per hour. For work on the fee question he will recover at the rate of $128 per hour, the average of the hourly rates he charged during the course of the litigation.

Mr. Newberg also seeks fees for hours spent by his former associate, John C. Gabroy who was only two years out of law school when he researched the fee issue in this case. We find the requested hourly rate of $50 to be reasonable.

We believe these rates are comparable to those awarded by other judges in this district. In *Meisel*, 80 F.R.D. 419, Judge Higginbotham awarded Mr. Ferleger hourly rates of $40 for work done in 1974 and the first half of 1975 and $60 (two-thirds of Mr. Ferleger's claimed hourly rate of $90) for work done thereafter. Judge Higginbotham's rationale was that the issues in *Meisel* were not novel or complex and the benefits achieved by the lawsuit minimal. We have settled on the slightly higher rate of $55–$65 for the 1975–1976 period because of the character of the *Vecchione* litigation and the greater benefit achieved.

We have also taken note of Judge Newcomer's recent opinion in *Mental Patients' Civil Liberties Project v. Hospital Staff Civil Rights Committee*, No. 73–1512 (E.D.Pa. February 2, 1979), in which Mr. Ferleger was awarded $50 per hour for services rendered from 1973 to 1975. Judge Newcomer observed that the issues in the case, while novel, were not complex; rather the case was comparable to the "average" case. He therefore reasoned that the general marketplace rates should apply, and, noting that when Mr. Ferleger undertook the *Mental Patients* litigation his reputation as an expert in the field of mental health law had not yet been established, settled upon $50 per hour as reasonable.

We think the slight difference in the 1975 rate we have awarded here and that awarded in *Mental Patients* can be attributed to our view that *Vecchione* was not an "average" case. Rather we see it as having been a difficult one, not so much legally and factually as practically—in terms of the complexity of its implementation—and thus a case in which a somewhat higher rate of compensation than might otherwise be applied is justified.

The rates we have adopted are comparable to the historical rates submitted in *O'Neill, supra,* (before the ⅓ reduction) and to those found acceptable in *AAMCO, supra,* an extensive and complex private antitrust action. The rates also reflect the fact that at one time or another Mr. Brewer, Mr. Stein, Ms. Greenwood, and Mr. Ferleger each assumed the role of lead counsel in *Vecchione,* undertaking litigation responsibilities of the sort normally shouldered by lawyers with many more years of experience. We do not believe, however, that use of these rates will result in a windfall to counsel. Rather we find that the fee resulting is a reasonable one, warranted by the facts of the case.

Multiplying the approved hours by the above hourly rates, we have arrived at the following lodestar figures:

| ATTORNEY | | CASE IN CHIEF HOURS | FEE PETITION HOURS | HOURLY RATE | CASE IN CHIEF LODESTAR | FEE PETITION LODESTAR |
|---|---|---|---|---|---|---|
| BREWER | 1973 | 245.5 | 0 | $ 55 | $13,502.50 | $ 0 |
| | 1974 | 5 | 0 | 60 | 300.00 | 0 |
| | 1975 | 27 | 0 | 70 | 1,890.00 | 0 |
| STEIN | 1973 | .25 | 0 | 70 | 17.50 | 0 |
| | 1975 | 27 | 2 | 80 | 2,160.00 | 160.00 |
| | 1976 | 14.5 | 0 | 90 | 1,305.00 | 0 |
| | 1977 | 10 | 0 | 90 | 900.00 | 0 |
| DYE | 1977 | 18 | 0 | 60 | 1,080.00 | 0 |
| PLATT | 1977 | 20 | 0 | 90 | 1,800.00 | 0 |
| | 1979 | 0 | 2 | 90 | 0 | 180.00 |
| GREENWOOD | 1975 | 39.08 | (68 hrs. | 40 | 1,563.20 | |
| | 1976 | 269.75 | at | 45 | 12,138.75 | |
| | 1977 | 250.9 | $53 per | 50 | 12,545.00 | |
| | 1978 | 36.25 | hr.) | 60 | 2,175.00 | $ 3,604.00 |
| | 1979 | 28.17 | | 70 | 1,971.90 | |
| TOTAL | | | | | $53,348.85 | $ 3,944.00 |
| FERLEGER | 1975 | 95 | 0 | $ 55 | $ 5,225.00 | $ 0 |
| | 1976 | 71.25 | 0 | 65 | 4,631.25 | 0 |
| | 1977 | 350.65 | 0 | 70 | 24,545.50 | 0 |
| | 1978 | 43.93 | 0 | 80 | 3,514.40 | 0 |
| | 1979 | 61.3 | 0 | 90 | 5,517.00 | 0 |
| TOTAL | | | | | $43,433.15 | $ 0 |
| NEWBERG | 1975 | 0 | (28.5 hrs. | $100 | $ 0 | |
| | 1976 | 0 | at | 100 | 0 | |
| | 1977 | 15 | $128 per | 135 | 2,025.00 | |
| | 1978 | 2 | hr.) | 135 | 270.00 | $ 3,648.00 |
| | 1979 | 0 | | 150 | 0 | |
| GABROY | 1975 | 0 | 15.3 | 50 | 0 | $ 765.00 |
| TOTAL | | | | | $ 2,295.00 | $ 4,413.00 |

* We have calculated the hours spent on the question of fees separately from the hours spent on the substantive issues in the case, since fee hours are subject to a different leveraging analysis than nonfee hours. *See* Part III, *infra* at 798.

---

### III. *The Multiplier*

The final step in our calculation of a reasonable fee is to determine whether the lodestar should be adjusted to account for exceptional circumstances. *Lindy* requires the court to consider whether an adjustment is merited because of the contingent nature of the case and the quality of counsels' work. In addition, *Hughes v. Repko*, 578 F.2d at 488–89 suggests that in civil rights cases the court evaluate the fee in light of the important substantive purposes of the civil rights acts.

## A. *Contingency*

Under the rubric of contingency, *Lindy* requires the court to "appraise the professional burden undertaken—that is, the probability or likelihood of success, viewed at the time of filing suit." *Lindy II, supra,* 540 F.2d at 117. This appraisal requires the court to analyze the plaintiff's burden both in terms of the legal and factual complexity of the case and of the probability that defendants' liability will be proved. *Lindy II* also charges the court to consider the risks assumed and the delay in receipt of payment for services rendered.

When attorneys' fees are awarded from a common fund, as in a class action securities case, for example, the greater the contingency undertaken by plaintiff, the more likely it is that the court awarding fees will increase the lodestar to reflect that risk. *See e. g., Miller v. Fisco,* Fed.Sec.L.Rep. ¶ 96,348 (E.D.Pa.1978). Yet as Judge Weis pointed out in *Prandini I,* 557 F.2d 1015, the contingency factor may produce a peculiar result in civil rights cases where fees are sought under statutory authority:

> We are aware of the differences in rationale underlying the awards of fees from a fund produced for the benefit of a class and those provided by statute. In the former case, the court exercises its equitable jurisdiction over the relationship between an attorney and his amorphous client, and factors which would appropriately have influenced the fee arrangement made between private parties, such as the contingency of litigation, are relevant. In the latter case, the statutory fee is often a part of the defendant's penalty for violating the applicable law. Contingency may be of little significance in that situation if the result is to give a smaller fee to the plaintiff's lawyer who recovers from a defendant in flagrant violation than the attorney who succeeds in establishing liability in a very close case. The contingency factor would be less where the liability is easily proved than where it is questionable. Hence, the penalty fastened on the defendant would vary in inverse proportion to the strength of the case against him.

*Id.* at 1020.

Judge Garth noted this anomaly in his concurrence in *Hughes v. Repko,* 578 F.2d at 491, stating that where the district court is not impressed with the contingent nature of the case, it should make no adjustment in the lodestar, for to reduce the fee award where the constitutional or statutory violation is clear would be to penalize the plaintiff's attorney, while to increase the award where the case was weak would be to penalize a less culpable defendant.

We note these views because *Vecchione* involved what were clear constitutional violations. Indeed, our initial opinion (*Vecchione I,* 377 F.Supp. at 1370) describes defendant's conduct as more objectionable than that condemned in the leading case of *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). In comparing defendants practice of summarily appropriating the funds of mental patients to practices found in other cases to violate due process, we were unable to find any redeeming features at all. Thus we view the contingency factor here as low, since at the time the case was filed there was ample precedent for finding a constitutional violation, and a minimal risk that defendant would prevail. We do not see *Vecchione* as having been a legally or factually complex case at the outset, and in calling into question defendant's appropriation of plaintiffs' property, counsel did not advance a novel theory. This is not to say that the litigation proved itself easy—the number of opinions filed demonstrate the contrary, and the implementation of what was a straightforward initial decree proved to be an enormously difficult task. We note only that at the time the case was filed, *i. e.,* in terms of what *Lindy II* calls the "professional burden undertaken," the probability of a finding for plaintiff was great.

We turn to the other factors subsumed under the category of contingency. In analyzing the "risks assumed in developing the case," *Lindy II* requires the court to consider the *number of hours of labor risked*

without guarantee of remuneration, and the amount of out of pocket expenses advanced. When this litigation commenced, of course, there was a very real possibility that counsel would not recover fees, since at that time the Fee Awards Act was not law, and no one could have foreseen the bad faith defendants would display. Furthermore CLS was not in the business of pursuing fee generating cases.[19] However, we do not view the fact that the possibility of a fee recovery was remote to be terribly relevant here, since CLS—because it is funded by the state and because it is precluded by its charter from taking on fee generating cases—cannot truly be said to have undertaken a risk of no remuneration in the sense that *Lindy* contemplates. For the same reasons, we do not believe that expenses advanced under these circumstances have relevance in our consideration of the contingency factor.

When Mr. Ferleger undertook to intervene on behalf of Walter Buress in 1975 the posture of *Vecchione* had altered drastically, for the constitutional questions had already been adjudicated and it was apparent that the Commonwealth was not going to comply with the terms of the injunction without further action from the court. Thus it can be said that Mr. Ferleger's risk of expending hours without compensation was less than that of CLS, for he might anticipate recovery on a bad faith theory and indeed, shortly after the April, 1975, consent decree was approved, he moved for counsel fees on that ground. We therefore do not believe that the contingency factor should play a part in an adjustment of Mr. Ferleger's lodestar.

We have concluded, however, that the third *Lindy* factor—the delay counsel have experienced in recovering their fee—warrants an increase in the lodestar. It has been over four years since counsel first petitioned this court for an award of fees. In 1977 they sought an interim award of fees, which, because the case was still ac-

tive, we denied. We believe that an increase in the lodestar to compensate for this lengthy delay will serve the dual purpose of rewarding counsel, who have sought to remedy a flagrant constitutional violation, and penalizing highly culpable defendants, and thus that an increase under this aspect of the contingency analysis fits within the *Lindy* rationale and will not work the anomalous result noted by Judges Weis and Garth. We will therefore increase the lodestar by 10% to compensate counsel for the delay in recovery of their fee.

### B. *Quality*

*Lindy I* permits an adjustment in the lodestar to reflect the quality of an attorney's work. "Any increase or decrease in fees to adjust for the quality of work is designed to take account of an unusual degree of skill, be it unusually poor or unusually good." 487 F.2d at 168. *Lindy II* cautions the court awarding fees not to lose sight of the fact that a consideration of quality necessarily inheres in the lodestar itself. "[C]ounsel who possess or who are reputed to possess more experience, knowledge and legal talent generally command hourly rates superior to those who are less endowed. Thus, the quality of an attorney's work *in general* is a component of the reasonable hourly rate . . . ." 540 F.2d at 117.

*Lindy II* identifies certain factors the court may consider in determining whether to make an adjustment for quality, including, *inter alia*, the actual benefit—monetary or nonmonetary—conferred and the professional methods used in the case—rewarding efficiency and penalizing any action used to delay or obstruct the proceedings.

We have reviewed *Vecchione* in light of these factors and have determined that an increase of 25% in the lodestar is warranted for the quality of counsels' work.

Although defendants have attempted to minimize the results achieved in this litigation, it is our opinion that the benefits

---

19. As CLS has pointed out in their briefs, however, the private attorney general theory for recovery of counsel fees had viability at the

time and could conceivably have provided a basis for an award of fees.

conferred on plaintiff class are substantial. A partial listing of those benefits can be found in *Vecchione III*, 80 F.R.D. at 48–49. Rather than rescribe all of them here, we note only certain major accomplishments of the case. First, the unconstitutional prior regime has been abolished and persons confined in Mental Health/Mental Retardation facilities are now presumed competent to handle their own monetary affairs and are doing so in large numbers. Second, the Guardian Office, members of whose staff are being appointed to manage the property of persons who are adjudicated incompetent, has been established as an autonomous entity; guardians are subject to stringent regulations, drafted by the parties, governing their fiduciary duties. Third, $9.1 million in money wrongfully withheld by the Commonwealth after the issuance of the July, 1974, *Vecchione* decree has been or is in the process of being refunded to class members.

Defendants have correctly argued that much of the $9.1 million fund (and indeed any money that patients may now or will in the future manage for themselves) is subject to recovery by the Commonwealth to cover the cost of care and maintenance incurred by class members while institutionalized. That fact does not render the benefit ephemeral, however, since the nonmonetary aspects of the *Vecchione* settlement serve to insulate the funds from claims by the Commonwealth in significant ways, and to insure that assessments are fair and just: (1) *Vecchione* provides that bills for care and maintenance give notice of the right to a hearing to challenge the assessment; (2) bills must give notice of the defenses that may be asserted; (3) judgment may be entered against a person who has failed to pay his or her bill only following a full hearing; (4) patients who have challenged their bills may not be subjected to different care or treatment on account of their actions.

While defendants have argued that the "rights" outlined above preexisted *Vecchione* and cannot be deemed results of counsel's efforts, we are constrained to observe that prior to this litigation, any rights class members may have had with respect to their property were illusory, since more often than not they were unaware of them and, as this lawsuit has shown, defendants were ignoring them. The signal benefit of *Vecchione* is that it generated a coherent statement identifying the property rights of Mental Health/Mental Retardation patients, insuring their notice of those rights as well as defendants' knowledge of their obligations. That benefit is not insignificant.

Our assessment of the benefits conferred attests to the very high quality of counsels' work. We add only that their conduct was professional throughout, even in the face of the substantial obstacles that from time to time impeded the progress of this lawsuit. In sum, we find that an increase in the lodestar for quality is amply justified by the record before us.

### C. *Substantive Purposes of the Civil Rights Act*

In *Hughes v. Repko*, 578 F.2d 483, the Court emphasized that in civil rights cases the fee to be awarded should be evaluated in light of the important substantive purposes of the Civil Rights Acts. In his concurring opinion in *Hughes*, Judge Garth attempted to set forth in some detail the process to be followed by a district court making such an evaluation.

For example, in an award under the Civil Rights Act, the district court should take into account the fact that the Civil Rights Attorney's Fees Awards Act is designed to give persons who are victims of civil rights violations effective access to the judicial process. *See* H.R.Rep.No. 94–1558, 94th Cong. 2d Sess. 1 (1976). The Act is also intended to enhance the enforcement of the Civil Rights Act, which depends heavily on private enforcement, and to grant citizens "a meaningful opportunity to vindicate important Congressional policies which these laws contain." S.Rep.No.94–1011, 94th Cong. 2d Sess. 2, *reprinted in* 5 [1976] U.S.Code Cong. & Admin.News, pp. 5908, 5910. Thus, recognizing the "private attorney

general" policy behind the Awards Act, the district court might consider, *inter alia* : the importance of the constitutional right and congressional policy which has been vindicated; the number of citizens who have been benefited or whose rights have been vindicated (either as class members or through *stare decisis* ); the extent of the constitutional violation which has been remedied (*i. e.* how widespread or pervasive was the civil rights violation); whether the attorney has successfully advanced a novel theory or interpretation; the extent to which the public interest has been served. *See Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

*Id.* at 492, n.5.

Applying these criteria to *Vecchione*, we conclude that the case has significantly furthered the substantive purposes of 42 U.S.C. § 1983 and that the fee award should be increased to reflect that contribution. We do not pick and choose among constitutional rights in attempting to assess the importance of the rights at issue here, *see Imprisoned Citizens Union v. Shapp*, 473 F.Supp. 1017 (E.D.Pa.1979), but note that the right of mentally handicapped persons—a class that until recently had few champions and little access to courts—to the protections of the Fourteenth Amendment is clearly an important one. The class of persons affected by the *Vecchione* decree is a large one—anyone who has been or will be confined in state MH/MR facilities will benefit from its provisions. The constitutional violation that *Vecchione* cures is one that pervaded the entire state mental health system. And while the constitutional violation was blatant, see *supra* at 794 and *Vecchione I*, 377 F.Supp. at 1370, the negotiations and attention to detail that its remedy required called for dedication and patience beyond that of the usual case. In short, we believe not only that the public interest was furthered by this litigation but that the scope of its results would not have been so vast absent the extraordinary diligence of counsel.

One further observation is in order. In *Hughes*, Judge Garth opined that in deter-

mining whether to adjust the lodestar to reflect the extent to which the substantive purposes of the civil rights acts have been furthered, the court is at liberty to consider "any rational factors that are relevant to the particular case," so long as those factors are articulated and supported by the record. *Id.* at 492. One unique facet of *Vecchione* to which we have alluded is the defendants' recalcitrance. They did nothing to comply with the terms of the 1974 injunction for about a year and refused to implement the 1975 consent decree, choosing instead to attack it (and by implication the injunction) via eleventh hour Rule 60(b) motions.

A reading of the various *Vecchione* opinions will reveal the extent of defendants' obduracy in the face of clear mandates from the Court. We rescribe our observation in *Vecchione III, supra*, 80 F.R.D. at 41, that this litigation was "by far the most vexatious" we had encountered since assuming the bench some 7½ years earlier. In affirming our denial of Rule 60(b) relief, Judge Gibbons wrote for the Court that defendants' claim that their attorney lacked authority to enter into the 1975 consent decree was clearly "a mere afterthought which cannot be entertained by any forum charged with the responsibility of discharging its judicial business with finality." *Vecchione II, supra*, 558 F.2d at 158. As to defendants' argument that we erred in denying their Rule 60(b) motion, Judge Gibbons further observed that the substance of their claim was "frivolous." *Id.* at 159. We cite this judicial language to briefly illustrate the ambiance that pervaded *Vecchione* from the outset. We think that defendants' conduct amounts in law to "bad faith."

Given this posture of resistance to the authority of the Court and to the efforts of plaintiffs' counsel to resolve the case, the fact that a very favorable settlement was finally reached is perhaps more significant than it otherwise would be. We therefore find that an increase in the lodestar is warranted as a result of the defendants' bad faith and vexatiousness. We believe such an adjustment will serve to both penalize obdurate behavior and encourage persistence in response.

We have determined that the lodestar should be increased by 65% because we have found that the litigation significantly furthered the substantive purposes of § 1983 of the Civil Rights Act. To the extent that it may be necessary to make a discrete determination of the percentage we have allowed for bad faith, we note that we have increased the lodestar by 20% as a result of defendants' conduct alone.

### D. Factoring Hours Spent on the Fee Question

One final point must be considered. *Prandini II*, 585 F.2d at 53, makes clear that in statutory fee award (as opposed to common fund) cases counsel may recover for time spent litigating the question of fees; the time thus spent is calculated under the *Lindy* lodestar analysis. *Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d at 1219 prohibits application of a multiple to such hours for contingency and quality, however, since those hours are "incurred apart from the prosecution of the main case, and it is upon the nature of the main case and the quality of the work done on it that adjustments to the lodestar are based."

In the recent case of *Bagby v. Beal*, 606 F.2d 411 (3d Cir. 1979) the Third Circuit stated that *Baughman* is not to be read as precluding an adjustment in the lodestar—including hours spent on the fee question—under the third factoring consideration articulated in *Hughes, i. e.*, the extent to which the litigation furthered the substantive purposes of the Civil Rights Act. Rather, in considering a fee sought under one of the civil rights attorneys fees statutes, the district court must decide "whether the calculated fee, including the portion that reflects compensation for work performed [on the fee question], is reasonable in light of the legislative history of the fee statute and the substantive purposes of the underlying civil rights statute involved." *Id.* at 417.

■ We do not take this language to mean that a court making an upward adjustment in the lodestar for work spent on the substantive issues in the case must increase the lodestar for work spent on the fee question by the same percentage amount. Rather we believe the fee hours may be increased by a different percentage, or not at all, in light of the considerations identified in *Bagby*, so long as the total fee award is reasonable.

We have considered this case in light of *Bagby* and believe that the fees as calculated under the *Lindy* and *Hughes* analyses are reasonable and that no adjustment should be made in the "fee lodestars" to reflect that underlying purposes of the Civil Rights or Fee Awards Acts. The hours spent on the fee question were substantial, and we find that the *Lindy* calculations alone amply compensate counsel for their time.

### IV. Costs

Fed.R.Civ.P. 54(d) provides that ". . . costs shall be allowed as of course to the prevailing party unless the court otherwise directs . . . ." Items that may be taxed as costs are identified in 28 U.S.C. § 1920 as follows: (1) fees of the clerk and marshal; (2) fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and copies of papers necessarily obtained for use in the case; (5) docket fees under § 1923; (6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under 28 U.S.C. § 1828. Although the authority to award costs is broad and committed to the sound discretion of the district court, *Farmer v. Arabian American Oil Co.*, 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964), traditionally, expenses not provided for by statute are not reimbursed except in unusual circumstances. Thus, the cost of such items as attorney travel and lodging, telephone, and postage have been borne by the litigants themselves and are not subject to recovery. 10 Wright and Miller, *Federal Practice and Procedure*, § 2666, 6 *Moore's Federal Practice* ¶ 54.77.

■ Some courts have held that since, under the American rule, *see* n. 1, *supra*,

attorneys' fees are not generally awarded, once the court finds authority to grant such fees—either by virtue of a statute or under one of the exceptions to the American rule—all costs are included in the concept of attorneys' fees, and expenses not normally reimbursed may be recovered. *See, e. g., Fairley v. Patterson*, 493 F.2d 598 (5th Cir. 1974) [20] and *Wheeler v. Durham City Board of Education*, 585 F.2d 618 (4th Cir. 1978). We see nothing in the history of the Fee Awards Act to require this result. By its terms the Act permits the district court to award "a reasonable attorney's fee as *part* of the costs." (emphasis added). It seems logical to conclude that by this language Congress was choosing only to authorize recovery of one discrete type of cost—attorney's fees—and that other costs are to be awarded under separate authority—whether by virtue of a federal statute, "rule of court, or in the custom, practice, and usage applicable in a particular district." 6 *Moore, supra*. We do not view the Fee Awards Act as rendering 28 U.S.C. § 1920 inoperative, nor does there seem to be reason to assume that the term "attorney's fee" as used in the statute includes the concept of expenses. We decline to adopt such a construction.

The courts in this district that have considered in detail the question of what costs may be allowed have taken a similar view. Thus, Judge Huyett in *Wehr v. Burroughs Corp.*, 477 F.Supp. 1012 (E.D.Pa.1979), concluded that under the Age Discrimination in Employment Act, which requires the court to award a reasonable attorney's fee and costs of the action, the term "costs" was limited to statutory costs and did not include out-of-pocket expenses such as Lexis fees, telephone charges, travel, and the cost of meals and exhibits. In *Shannon v. United States Department of Housing and Urban Development*, 433 F.Supp. 249 (E.D.Pa. 1977), Chief Judge Lord held that since the only reference to costs in the Attorney's Fees Awards Act was to an allowance of fees as costs, recovery of other costs and

expenses was confined by the boundaries of § 1920. In *Meisel v. Kremens*, 80 F.R.D. at 427, Judge Higginbotham awarded costs he found to be recoverable under § 1920. In *Herrington v. Abington School District*, Civ. No. 77–1473 (E.D.Pa. May 30, 1979), Judge Fullam refused to permit recovery for telephone calls and postage, which he held were subsumed within the overhead allowance included in the fee award. Judge Fullam did permit recovery of the cost of obtaining deposition transcripts and accident reports, costs that are sometimes viewed as falling within the list of taxable items in § 1920, *see Action Alliance for Senior Citizens of Greater Philadelphia, Inc. v. Shapp*, 74 F.R.D. 617 (E.D.Pa.1977), and sometimes seen as awarded by virtue of the court's equitable power to reimburse the cost of items whose expense appeared to have been reasonably necessary at the time it was incurred. 10 Wright and Miller, *supra*, §§ 2676 and 2677; 6 *Moore, supra*, ¶ 54.77[4] and [6].

In reviewing the particular expenses sought to be recovered here, we have kept in mind the admonition of the Supreme Court in *Farmer*, 379 U.S. at 235, 85 S.Ct. at 416, that "the discretion given district judges to tax costs should be sparingly exercised with reference to expenses not specifically allowed by statute." We are also not unaware that an eleventh amendment immunity question might exist were we to tax costs absent congressional authorization. *Keyes v. School District No. 1, Denver, Colorado*, 439 F.Supp. 393, 417 (D.Colo. 1977); *see Shannon*, 433 F.Supp. at 252; *Alyeska*, 421 U.S. at 260, 95 S.Ct. 1612; *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565 at 2577, n. 27, 57 L.Ed.2d 522. We therefore decline to reimburse counsel for their expenses except as statutorily authorized.

We have determined that the following costs may be recovered:

*CLS*

CLS seeks reimbursement of $3,242.06 in costs and expenses. We will allow recovery

---

**20.** Since *Fairley*, all litigation expenses have routinely been awarded in decisions coming out of the Fifth Circuit. *See, e. g., Guajardo v. Estelle*, 432 F.Supp. 1373 (S.D.Tex.1977), *modi-* *fied on other grounds*, 580 F.2d 748 (5th Cir. 1978), and *Payne v. Travenol*, 74 F.R.D. 19 (D.Miss.1976).

of $2,427.58. This figure includes witness fees and travel (specifically authorized by statute, 28 U.S.C. §§ 1821 and 1920), and the cost of deposition transcripts, (see Action Alliance, supra), and photocopies,[21] all expenses which we find to have been reasonably incurred in connection with the case. We have disallowed the cost of postage, telephone, expert fees, and attorney travel, lodging and meals.

*David Ferleger*

Mr. Ferleger seeks to recover costs and expenses amounting to $1,218.83. We will permit recovery of $329.00 consisting of the cost of photoreproduction. We have disallowed the balance of claimed costs, which comprise in the main Mr. Ferleger's travel, lodging and telephone expenses. Nor will we permit recovery of $225.00 in expenses claimed in Mr. Ferleger's final itemization submitted in May, 1979. This figure is, in counsel's own words, merely an estimate and includes telephone and travel costs. We find this unsubstantiated estimate insufficient to support an award of costs, particularly since it includes items that we have determined to be noncompensable.

*Herbert Newberg*

Mr. Newberg seeks to recover $221.50 in expenses. We will allow $155.50 in reproduction costs but will not permit reimbursement of the balance of $66.00 in telephone costs.

**V. Conclusion**

■ Except with respect to Mr. Newberg, see n. 15 supra, we have determined that the lodestar figures for the case in chief, which appear supra at 793, should be increased by 100%, or a factor of 2, to account for the delay in recovery of the fee, the quality of counsel's work, and the extent to which the litigation furthered the substantive purposes of the statute under which it was brought. We have also determined that no increase in the lodestars for time spent on the issue of the attorneys'

fees is warranted. For the reasons outlined at such length above, we believe the total fees thus arrived at are reasonable.

The final tabulations are as follows:

CLS

| | | | |
|---|---|---|---|
| Case in Chief | $53,348.85 x 2 = | $106,697.70 |
| Fee Petition | | 3,944.00 |
| Total Fee | | $110,641.70 |
| Total Costs | | $ 2,427.58 |

David Ferleger

| | | | |
|---|---|---|---|
| Case in Chief | $43,433.15 x 2 = | $ 86,866.30 |
| Fee Petition | | |
| Total Fee | | $ 86,866.30 |
| Total Costs | | $ 329.00 |

Herbert Newberg

| | |
|---|---|
| Case in Chief | $ 2,295.00 |
| Fee Petition | $ 4,413.00 |
| Total Fee | $ 6,708.00 |
| Total Costs | $ 155.00 |

---

**21.** The cost of photocopies is sometimes viewed as authorized under § 1920(3) and (4). See, e. g., O'Neill, 431 F.Supp. at 713 and Meisel, 80 F.R.D. at 427. Other courts have not viewed these costs as authorized by statute but have nevertheless awarded them when they were deemed reasonable and necessary to the case. See e. g., Herrington, supra, slip op. at 5.