**Philip CLARKE, on behalf of himself and all others similarly situated, Intervenor-Plaintiff,**

v.

**AMERADA HESS CORPORATION, Defendant.**

**No. 73 Civ. 4263 (JMC).**

United States District Court, S. D. New York.

July 15, 1980.

Berger & Montague, P. C., by Warren D. Mulloy and Roger J. Bernstein, Philadelphia, Pa., Brown, Prifti, Leighton & Cohen, Boston, Mass., and Goldschmidt, Fredericks, Kurzman & Oshatz, New York City, for intervenor-plaintiff.

Milbank, Tweed, Hadley & McCloy, by Adlai S. Hardin, Jr. and Toni C. Lichstein, New York City, for defendant.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

After a bench trial of Count 2 of the complaint, the Court finds for the defendant, and dismisses Count 2.

Upon the joint application of counsel for the intervenor-plaintiff and class representative, and counsel for the defendant, and after a hearing held on November 12, 1979, the Court approves the proposed settlement of Counts 1 and 3 of the complaint. Fed. R. Civ. P. 23(e).

Motion by counsel for the intervenor-plaintiff and class representative, for fees and costs in connection with the settlement of Count 3 of the complaint, is granted.

These are the Court's findings of fact and conclusions of law. Fed. R. Civ. P. 52(a).

## BACKGROUND

The following facts are undisputed. Defendant in this action, Amerada Hess Cor-

poration ["Hess"] is a well-known multinational oil company, which, among its many activities, refines and markets gasoline under the trademark and trade name "Hess." This case is about Hess's marketing structure for the retail sale of its gasoline.

"Hess" gasoline stations, while not unique, differ from most other gasoline stations in that they sell only gasoline and a small variety of other automotive products, and provide no repair or maintenance services. Hess maintains close control over the architectural and decorative design of the buildings, arrangement of pump islands, landscaping, lighting and signs at its stations, as well as over the quality and reliability of station personnel. Indeed, in the geographical areas in which they are located, the physical appearance of and type of service offered by Hess stations are virtually identical.

One of the means of maintaining such consistency has been a strict policy whereby Hess owns all of its retail stations in fee, or else holds them under long-term leases. This is not to say that Hess operates them all with salaried employees. But unlike many other franchisors, it has no franchisees who own or have long-term leasehold interests in the land, buildings, or fixtures needed to run their businesses. For every single one of its gas stations, Hess owns not only the land and the buildings, but all of the pumps, tanks, wiring, plumbing and pavement.

Approximately half of Hess's stations are "company managed," that is, the manager and workers at such stations are employees who receive their compensation directly from Hess. The remainder are operated by "independent" dealers, who lease the stations and purchase their inventory of gasoline and other automotive products from Hess at wholesale. These independent dealers receive no salary or other compensation from Hess, and must rely exclusively on profits from retail sales. They make their own decisions about retailing pricing, personnel, and local advertising, within broad limits established by their dealership agreements with Hess.

Under the typical Hess lease, rent is calculated as a percentage of gasoline sold, so that the higher volume stations command the higher rents. Besides rent, the dealer must pay state and local property, license, and user taxes and fees, and must also maintain liability and property damage insurance at or above a minimum set by the lease. Additionally, the dealer is responsible for care and maintenance of the station, and repair and replacement of the heating system and minor equipment such as light bulbs, faucets, pump nozzles, office furniture and shrubbery. Hess is responsible for most major maintenance and repair.

Pursuant to the dealership agreement with Hess,[1] the dealer agrees to acknowledge Hess's ownership of its trademarks, to maintain the station and provide service in accordance with Hess policies, to sell under Hess trademarks only Hess's products, and not to alter the station in any way that would affect its distinctive design. Moreover, the dealer agrees not to use the station for anything other than a "gasoline filling station."

When first establishing an independent dealership at a particular location, Hess does not "sell" a franchise. The dealer pays no money for the business opportunity, either at the outset, or thereafter in the form of a franchise fee, license royalty, or other type of assessment. While the dealer is obligated to deposit a sum of money with Hess [called a collateral deposit in the agreements], this is to protect Hess against the dealer's default on his contractual obligations. The deposit accrues interest, and upon termination of the dealership agreements, Hess refunds it to the dealer unless it claims losses as a result of the dealer's wrongful conduct.

1. The contractual relationship between Hess and its dealers may be embodied in a single, comprehensive document, or in two or more related documents. The Court finds no significance in the difference, and therefore will refer to either arrangement as a "dealership agreement."

Generally, the dealership agreements are for a renewable fixed term, usually a month. As a rule, however, Hess's policy has been to renew them automatically.

The complaint in this action, brought on behalf of all Hess independent dealers, contains three claims. The parties have agreed to stay the first claim pending resolution of a related suit in the Eastern District of Pennsylvania, and have agreed to a settlement of the third claim charging a price-fixing conspiracy to require Hess dealers to honor Diner's Club credit cards. What is now before the Court, therefore, is the parties' joint application for approval of the settlement pursuant to Fed. R. Civ. P. 23(e), as well as resolution of the second claim of the complaint, which charges that certain clauses in the dealership agreements prohibiting assignment of the dealership by the dealer violate section 1 of the Sherman Act, 15 U.S.C. § 1. Jurisdiction is based on the antitrust laws. 15 U.S.C. § 15.

## FINDINGS

The second claim of the complaint was tried to the Court without a jury on December 19 and 20, 1978. On the basis of the evidence adduced at trial, the Court makes the following findings:

1. Hess's dealership agreements negotiated before 1976 generally contained a clause that permitted a dealer to assign his rights and interests under the agreement ["contractual dealership rights"], so long as the dealer obtained Hess's approval. All Hess dealership agreements negotiated thereafter contained a clause prohibiting assignments under any circumstances.

2. At the time of the trial of this action, intervenor-plaintiff Philip Clarke operated a Hess station in Kingston, New York, pursuant to a pre-1976 dealership agreement containing a conditional assignment clause. He maintains, however, that it has been and still is Hess's policy to withhold approval of all assignments. The Court finds that Hess has on occasion withheld its approval of an assignment because it wished to operate the station directly.

3. The intervenor-plaintiff defines the relevant market as that in *dealerships* in "high volume gas-only" retail gasoline stations, restricted geographically to fourteen East Coast states. In other words, this is not the retail gasoline market in which motorists purchase, but rather one in which willing entrepreneurs buy and sell business opportunities, namely, to run "high volume gas-only" stations. The Court finds, however, that intervenor-plaintiff has failed to show that this proposed market is sufficiently distinguishable from the market in dealerships in *all* types of gas stations, including those that offer full repair, maintenance, and parts service as well as gasoline. Moreover, there is little evidence that the proposed geographical limits define a truly separate market.

4. Even accepting intervenor-plaintiff's market definition, the Court finds no evidence that Hess has now or ever had any intent to monopolize this market, or that it possesses monopoly power, or that there is a dangerous probability that it may succeed in attaining such power.

5. Hess dealers do have certain rights protected by state and federal law to continue as dealers unless Hess can demonstrate cause for terminating their agreements.[2] Such rights to continue as dealers ["statutory dealership rights"], coupled with the contractual dealership rights, do have

---

2. The federal statute is Subchapter I, "Franchise Protection," of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2806, which is noted at 25 S.D.L.Rev. 69 (1980). For an example of a state statute, see the New Jersey Franchise Practices Act, N.J.Stat.Ann. §§ 56:10–1 to :10–15 (West Supp. 1979–1980). In some states, such rights have been created by case law. *See, e. g., Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974).

*But see Mobil Oil Corp. v. Rubenfeld*, 48 A.D.2d 428, 370 N.Y.S.2d 943 (2d Dep't 1975), *aff'd mem.*, 40 N.Y.2d 936, 390 N.Y.S.2d 57, 358 N.E.2d 882 (1976). *See generally* Brown & Cohen, *Franchising: Constitutional Considerations for "Good Cause" State Legislation*, 16 Hous.L.Rev. 21 (1978); Comment, *Franchise Regulation, An Appraisal of Recent State Legislation*, 13 B.C.Indus. & Com.L.Rev. 529, 553–64 (1972); Note, *Regulation of Franchising*, 59 Minn.L.Rev. 1027, 1036–49 (1975).

economic value, which can be ascertained by determining the price an outsider would pay for them. Another measure of their value is the price Hess would have to pay to induce a dealer to relinquish his rights. Plaintiff's evidence suggests that the value depends upon numerous circumstances, and may vary from as little as $5,000 to as much as $50,000, and possibly higher.

6. Hess believes that the laws of the States of Delaware, Maryland, Massachusetts, New Jersey and Virginia prohibit no-assignment clauses.[3] Most of the evidence adduced in this case, however, pertains to the State of New Jersey,[4] which will therefore be used as an example throughout this Memorandum.

In these five states, Hess maintains a policy of permitting its dealers to transfer their dealerships for consideration. Although the pertinent laws may be open to contrary interpretation, Hess has apparently chosen this course rather than risk litigation.[5] Intervenor-plaintiff in this action has challenged the reasonableness of neither Hess's choice in this regard, nor of its interpretation of the pertinent laws. One must assume that Hess's policy of permitting assignments increases the dealerships' value in these states.

7. Through investments of their own time and money, Hess dealers can and do add to the value of their "dealerships," meaning the bundle of contractual and statutory dealership rights, largely by creating enduring customer and community relationships. For the purpose of this case, such accretions to value may be deemed "goodwill."

---

**3.** *See* Transcript of Proceedings at 125 (Dec. 18 & 19, 1978).

**4.** The New Jersey Franchise Practices Act, N.J. Stat. Ann. §§ 56:10–1 to :10–15 (West Supp. 1979–1980), appears to allow the franchisor to obstruct transfer of the franchise only for reasons related to the "character, financial ability or business experience of the proposed transferee":

> It shall be a violation of this act for any franchisee to transfer, assign or sell a franchise or interest therein to another person unless the franchisee shall first notify the franchisor of such intention by written notice setting forth in the notice of intent the prospective transferee's name, address, statement of financial qualification and business experience during the previous 5 years. The franchisor shall within 60 days after receipt of such notice either approve in writing to the franchisee such sale to proposed transferee or by written notice advise the franchisee of the unacceptability of the proposed transferee setting forth material reasons relating to the character, financial ability or business experience of the proposed transferee. If the franchisor does not reply within the specified 60 days, his approval is deemed granted. No such transfer, assignment or sale hereunder shall be valid unless the transferee agrees in writing to comply with all the requirements of the franchise then in effect.

*Id.* § 56:10–6. Moreover, it makes it a prohibited practice for any franchisor, *inter alia*:

> To require or prohibit any change in management of any franchisee unless such requirement or prohibition of change shall be for good cause, which cause shall be stated in writing by the franchisor[,]

> To restrict the sale of any equity or debenture issue or the transfer of any securities of a franchise or in any way prevent or attempt to prevent the transfer, sale or issuance of shares of stock or debentures to employees, personnel of the franchisee, or heir of the principal owner, as long as basic financial requirements of the franchisor are complied with, and provided any such sale, transfer or issuance does not have the effect of accomplishing a sale of the franchise[, or]

> . . . . .

> To provide any term or condition in any lease or other agreement ancillary or collateral to a franchise, which term or condition directly or indirectly violates this act.

*Id.* § 56:10–7.

Additionally, the statute defines "franchise" as follows:

> "Franchise" means a written arrangement for a definite or indefinite period in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

*Id.* § 56:10–3(a). This Court has found no published decisions determining the effect of these provisions on the type of non-assignment clause used in Hess dealership agreements.

**5.** Section 56:10–10 of the New Jersey Franchise Practices Act provides for a private right of action by a franchisee against its franchisor, and for the franchisor's payment of successful franchisees' attorneys' fees.

8. A market exists for Hess dealerships, in that there are buyers willing to pay for the opportunity to operate a Hess station and the contractual and statutory dealership rights that go with it. In the five states mentioned above, where Hess's policy is to permit dealers to transfer their dealerships for consideration, dealers have received substantial sums of money for their dealerships. In other states, dealers have been offered substantial sums, but have been unable to consummate any transactions, because of either absolute no-assignment clauses in their dealership agreements, or Hess's refusal to approve a transfer.

9. Hess has in some instances paid dealers to relinquish their statutory and contractual dealership rights, even in states where Hess believes it may legally prohibit assignments. The reason for this is that attempting to terminate a dealer often results in litigation, which is costly even if Hess ultimately prevails. A portion of the amount paid by Hess for such relinquishment may in some cases be attributable to goodwill generated by the dealer.

## DISCUSSION

### Count 2

Since the Court's findings in this case have ruled out any claim under section 2 of the Sherman Act, 15 U.S.C. § 2, the Court will restrict its discussion to intervenor-plaintiff's section 1 claim or claims. Although they have not always been articulated clearly and consistently, intervenor-plaintiff's claims seem to boil down to three alleged effects of Hess's no-assignment clauses and its restrictive policy towards approving assignments: (1) that they prevent the dealer from selling his contractual and statutory dealership rights, including that portion of their value attributable to goodwill generated by him; (2) that they reduce the number of "high volume gas-only" dealerships available to interested entrepreneurs; and (3) that they place Hess in a position of a monopsonistic buyer when it seeks to terminate a dealer, or when a dealer wishes to terminate his dealership agreement. Intervenor-plaintiff contends that all three of these effects constitute "restraints of trade or commerce."

The problem with intervenor-plaintiff's theory is that all three of these "restraints" flow from one source: Hess's retention of property rights in the dealership. Ownership of property is always in some ways a restraint of trade. Any owner who refuses to sell his property ipso facto reduces the amount of such property that is available for purchase. And a rightful owner's claim prevents anyone else from selling the property, even one who has acquired limited rights to its use, whether by lease, contract or operation of law. Moreover, it follows that an easement holder or tenant who cannot sell his rights on the open market, but who seeks compensation for relinquishment of such rights, must deal with a "monopsonistic" buyer, to wit, the landlord.

Yet, it hardly follows that the antitrust laws should require every property owner to sell his property, or to allow third parties with limited interests in it to sell their interests. As Mr. Justice Brandeis stated over sixty years ago, not every restraint of trade is illegal:

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.

*Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

History abounds with cases under the antitrust laws upholding property owners' rights to do what they please with their own property, even to the extent of excluding others from its enjoyment. *See, e. g., United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). Absent a monopoly, an attempt or conspir-

acy to monopolize, or any other agreement or practice regarded as illegal per se, the crucial question is not whether the owner's use of or retention of various rights in his property restrains trade, but rather, whether it does so *unreasonably. See generally,* e. g., E. Kintner, II Federal Antitrust Law § 9.20 (1980).

■ Before considering whether Hess's use and retention of various property rights in its gas stations is unreasonable, however, the Court must determine what these rights are. The intervenor-plaintiff appears to suggest that the respective obligations of Hess and its dealers under the dealership agreements must be construed according to federal law. This would appear to be true to the extent that certain aspects of the contractual relationship are governed by the Petroleum Marketing Practices Act.[6] With respect to all other aspects, however, neither this Act[7] nor the antitrust laws evince a distinctive national policy requiring a particular interpretation of ordinary contractual provisions. *See Miree v. DeKalb County,* 433 U.S. 25, 28–33, 97 S.Ct. 2490, 2493–2495, 53 L.Ed.2d 557 (1977); *Three Rivers Motors Company v. Ford Motor Company,* 522 F.2d 885, 888–93 (3d Cir. 1975). *Compare Ivy Broadcasting Company*

*v. American Telephone & Telegraph Co.,* 391 F.2d 486, 490–91 (2d Cir. 1968) (federal common law governs contractual duties with respect to interstate communications service) *with Bartsch v. Metro-Goldwyn-Mayer, Inc.,* 391 F.2d 150, 153–54 (2d Cir. 1968) (state law governs construction of copyright license agreement). Moreover, the cases cited by the intervenor-plaintiff in support of applying federal common law are inapposite here, since they apply only to the interpretation of releases from liability under federal statutes.[8]

■ In all of its dealership agreements, Hess has attempted to retain virtually all incidents of ownership of the gas stations as ongoing businesses, including the right to terminate the agreements at will. Thus, if the agreements were construed literally, the dealers would have no recourse if Hess evicted them at its whim. But since federal and state laws have declared such provisions unenforceable as written, all of the agreements must be construed as giving the dealer the right to continue his dealership absent cause for termination or nonrenewal. Consequently, Hess no longer owns the right to terminate its dealers at will. The economic effect of such legislation has been, as noted above, to vest in the dealers some

**6.** The pertinent section of the Act provides:
To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.
15 U.S.C. § 2806(a).

**7.** The Act itself states:
Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision

of State law which permits such transfer or assignment without regard to any provision of the franchise.
15 U.S.C. § 2806(b). In *Ted's Tire Service Inc. v. Chevron U.S.A. Inc.,* 470 F.Supp. 163 (D.Conn.1979), the court stated:
The [Petroleum Marketing Practices] Act does not preempt all state laws regulating petroleum franchises; rather it merely supplants those provisions which are different from the [Act]. The language of the . . . Act prohibiting states from enforcing "any provision of any law" which is different from the [Act], 15 U.S.C. § 2806(a), manifests a Congressional intent to treat state laws which govern petroleum franchises as severable.
*Id.* at 165.

**8.** *See Locafrance U.S. Corporation v. Intermodal Systems Leasing, Inc.,* 558 F.2d 1113 (2d Cir. 1977); *Artvale, Inc. v. Rugby Fabrics Corporation,* 363 F.2d 1002 (2d Cir. 1966); *Dale Hilton, Inc. v. Triangle Publications, Inc.,* 198 F.Supp. 638 (S.D.N.Y.1961).

of the property's value Hess otherwise would have had.

Furthermore, Hess believes, without any improper motive, that in five particular states, it cannot prevent a dealer from selling his dealership without risking costly litigation. In light of this perceived risk, Hess has chosen to permit dealers in these states to sell their dealerships to suitable third parties. The economic effect of this policy has similarly been to vest in the dealers in these states another portion of the property's value that Hess would otherwise have had.

 In all other states, however, Hess believes that it may legally refuse to allow a dealer to sell his dealership, and has acted accordingly. In some instances, it has included no-assignment clauses in the dealership agreements; in others, it has simply withheld approval of proposed transfers. The economic effect of this policy has been to retain for itself the portion of the property's value attributable to assignability. The question presented in this action, therefore, is whether Hess's retention of this portion of the property's value in states where such conduct is apparently legal under state law, is an unreasonable restraint on trade under the federal antitrust laws. The Court finds that it is not.

In the first place, there is nothing inherently pernicious about Hess's refusal to permit dealers to sell their dealerships. None of the dealers affected by this policy ever bargained for assignable rights. None ever paid a franchise fee, added significant improvements to the land, or made any other capital investment to acquire the dealership itself. That a dealer may have added to the value of the dealership is immaterial, because he received something in return for doing so: profits on his increased sales. The effect of the dealership agreement is that Hess gives the dealer the opportunity to make such profits, for which Hess receives rent *and* the dealer's efforts to maximize sales and increase the station's value. Under such an arrangement, the dealer is like any salesman who, by his creativity and industriousness, increases sales of his em-

ployer's product, thereby generating increased profits for the employer as well as an accretion to the value of the employer's business. Yet the salesman has little claim to that increment in value, since he has already been paid for it. ·

Second, and more important, the intervenor-plaintiff has shown no anticompetitive effect of Hess's restrictive policy. There is no claim that gasoline purchasers are in any way affected. As to potential purchasers of dealerships, there is no evidence at all that they are harmed. Hess does not pursue its policy for the purpose of increasing the price they must pay for dealerships. Indeed, precisely the opposite is the case. Hess makes its dealerships available without cost to the person who wishes to become a dealer. Such a policy effectively *lowers* barriers to entry. Moreover, there is no evidence that Hess's company-managed stations are in any way benefited by this policy. That Hess sometimes converts dealer-operated stations to company management is not, by itself, anticompetitive. *See, e. g., Fuchs Sugars & Syrups, supra.*

Indeed, the only ones who appear to be harmed in any way are the dealers themselves, who cannot sell what they did not buy. But this is hardly the type of injury the antitrust laws were intended to redress. As has been so often repeated, the antitrust laws protect "*competition, not competitors.*" *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The Court, therefore, finds that the intervenor-plaintiff has failed to prove any antitrust violation in connection with Hess's policy of refusing to allow dealers in all but five states to assign their dealerships, and accordingly, Count 2 of the complaint is dismissed.

*Count 1*

Count 1 in this action contains claims that are essentially the same as those contained in the complaint in *Bogosian v. Gulf Oil Corporation*, Nos. 71–1137, 71–2543 (currently pending in the Eastern District of Pennsylvania). All members of the class of the instant action are members of the *Bogosian* class unless they expressly request ex-

clusion, and the defendant Hess in the instant action is one of fourteen defendants in the *Bogosian* action. Moreover, the same attorneys represent the class representatives in both actions.

The parties have agreed that Count 1 of this action may be stayed pending the entry of final judgment in *Bogosian*, and have notified the class members of this agreement pursuant to an order signed by the Court. No class member has objected. Since the Court finds that such a stay would serve to economize the time and effort of both the courts and counsel, the parties' joint application in this regard is granted.

*Count 3*

■ The attorneys for the respective parties have jointly proposed to compromise Count 3 of the complaint as follows: The defendant will pay $250,000 into a settlement fund from which the class plaintiffs' attorney's fees and disbursements, to the extent allowed by the Court, will first be deducted. The remainder of the fund will then be distributed to the members of the plaintiff class in proportion to their Diner's Club sales between October 9, 1969, and December 31, 1973. The defendant will make the necessary computations at its own expense.

The Court has considered the proposed settlement of Count 3, and approves it for essentially three reasons. *First*, none of the class members has objected. *Second*, the proposed settlement is the product of arm's length negotiations, after extensive pretrial investigation and discovery, between capable and experienced attorneys. *Third*, it is eminently fair in light of the realities of litigating this count.

Even if the defendant were found liable for an antitrust violation on this count, it is doubtful that many members of the class could prove damages. The essence of the claim is that the defendant required the dealers to honor the Diner's Club credit card for purchases, but refused to permit the dealers to charge credit card customers prices different from those charged to cash customers. To be sure, this resulted in less profit on credit card sales than on cash sales, since the dealer received only 95% of the face value of the credit purchase slips. But it is unlikely that the dealer had to absorb the 5% cost of offering credit sales to Diner's Club customers, since most dealers probably passed this cost along to all of their customers, including those who neither wanted nor received the service.

Another problem with proving damages is that it is rare even in this day, and was probably unheard of in 1969 through 1973, for a merchant to discriminate in price between cash and credit card customers. Any dealer who would have voluntarily chosen to honor the card would probably have followed the common practice of not discriminating, and therefore, as to such dealers, the defendant's coercion in this regard probably caused no injury. As to those dealers who would simply have chosen not to honor the Diner's Club card, they would have to show that their losses were not offset by additional sales attributable to their honoring the card.

*Attorney's Fees*

Counsel for the plaintiff class have requested $75,000 for costs and fees plus $750 as anticipated expenses for administration of the settlement. In light of the time and effort spent on this case, which is nearly seven years old, the Court finds the request fair, and indeed, modest. Counsel have requested payment for only that portion of their time attributable to Count 3 of the complaint. For time spent prior to their agreement to a settlement in principle, which they maintain they cannot feasibly allocate among the three counts of the complaint, they have requested payment for one-third of their overall time. Similarly, for time spent after they agreed to a separate trial of Count 2, they have requested payment for only one-half of the time they spent negotiating the settlement of Counts 1 and 3. The Court finds this method eminently fair and reasonable to the class members.

■ Counsel have requested payment for their time at rates currently prevailing, cit-

ing as authority *City of New York v. Darling-Delaware*, 440 F.Supp. 1132, 1134 (S.D.N.Y.1977) (Stewart, J.). The Court disagrees, however. The delay in compensation is one of the risks counsel assumed in bringing this action, and is thus better left to the Court's consideration of a "risk factor" to be applied *after* calculating the value of their time at rates prevailing when the services were rendered. *See Desimone v. Industrial Bio-Test Laboratories, Inc.*, 83 F.R.D. 615, 621 (S.D.N.Y.1979) (MacMahon, J.); *AAMCO Automatic Transmissions, Inc. v. Tayloe*, 82 F.R.D. 405, 412–13 (E.D.Pa. 1979); *Weiss v. Drew National Corporation*, 465 F.Supp. 548, 552–53 (S.D.N.Y.1979) (Sweet, J.).

Nevertheless, the outcome here remains the same, because counsel, believing they were entitled to be paid at current prevailing rates, have not requested a risk factor to be applied to their "lodestar" figure. *See City of Detroit v. Grinnell Corporation*, 495 F.2d 448 (2d Cir. 1974). Thus, even if the value of counsel's time were computed at rates prevailing at the time the services were rendered, the Court would approve their request for $75,000 inclusive of costs and disbursements, as being a reasonable multiple of their "lodestar" figure, to compensate for the substantial risks of pursuing this litigation.

### CONCLUSION

In accordance with the foregoing, Count 1 of the complaint is stayed pending the entry of final judgment in *Bogosian v. Gulf Oil Corporation*, Nos. 71–1137, 71–2543 (E.D.Pa.). Count 2 is dismissed. The proposed settlement of Count 3, and the payment of costs and attorney's fees, are approved.

There being no just reason for delay, the parties shall submit to the Clerk of the Court a partial judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, dismissing Count 2 of the complaint, discontinuing Count 3 pursuant to the settlement approved herein, and providing for the payment of costs and attorney's fees, as also approved herein.

Upon entry of partial judgment pursuant to Rule 54(b), the Clerk of the Court shall transfer this action from the Court's active docket to its suspense docket. S.D.N.Y. Calendar Rule 20(a).

Submit Judgment on Consent.

SO ORDERED.