**Joseph PHILLIPS, et al., Plaintiffs,**

**v.**

**Gayle WEEKS, et al., Defendants.**

**No. LR–72–C–26.**

United States District Court, E.D. Arkansas, W.D.

Feb. 1, 1984.

Richard Mays, Mays & Crutcher, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

EISELE, Chief Judge.

This case was filed in January 1972, alleging that there was a pattern and practice of police misconduct toward a class of persons consisting of all blacks who have ever resided in or visited the city of Little Rock, Arkansas. The case was tried to the Court in December 1974 and January 1975, consuming some 30 days. During the course of the hearing the Court made certain findings of fact from the bench, while other findings and conclusions were made after the trial. In summary, the Court found that the plaintiffs had failed to establish a pattern, practice, or policy of police brutality engaged in by, or at the direction of, any of the defendants. The Court did find merit or, at least, serious problems with respect to some of the complained-of incidents. But these isolated individual instances of police misconduct simply did not warrant a finding of any policy or practice of official misconduct on the part of the defendants. Subsequently, the parties discussed the possibilities of a consent decree with respect to certain areas of declaratory relief. Although they were near agreement on a number of occasions, their efforts ultimately failed and the Court finally addressed the remaining unresolved issues in its Memorandum Opinion of June 21, 1983. In that Opinion (hereinafter Opinion I), the Court granted the plaintiffs' request for a declaratory judgment with respect to the "S" book procedure and further found that: (1) the changes in the citizen complaint procedure were brought about by the lawsuit; (2) the plaintiffs' lawsuit, and the efforts of their attorneys, were necessary and important factors in the defendants' decision to integrate the jail or at least in the timing of that decision; and (3) the law does not recognize an absolute right of minors to the presence and assistance of their parents during custodial interrogation and ac-

James L. Sloan, Asst. City Atty., Little Rock, Ark., for plaintiffs.

cordingly denied the plaintiffs' request for a declaratory judgment of this issue. The Court also included in Opinion I its views on those facts which affect the underlying attorney's fee issues, acknowledging that plaintiffs were the prevailing parties on the issues of the "S" docket, the citizen complaint procedure and the desegregation of the jail. By deciding that the plaintiff was the prevailing party on these three issues, Opinion I resolves Section 1988's threshold consideration of who is the prevailing party and leaves for resolution the issue of what is a reasonable attorney's fee in this case.

With the resolution of the issues litigated in the *Phillips* case, the Court finds itself in the position of determining a reasonable attorney's fee when the plaintiff prevailed, but only to a limited degree. The major thrust of the Court's inquiry will be to determine the significance of the relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation. This is the issue addressed by the Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a case similar to *Phillips* in that it involved civil rights, required lengthy proceedings and resulted in a partially prevailing plaintiff litigating the issue of a reasonable attorney's fee.

The *Hensley* plaintiffs challenged the constitutionality of treatment and conditions at the forensic unit of the state hospital. The district court found that the plaintiff prevailed in five of the six areas of alleged constitutional violation. When awarding the attorney's fees, the district court refused to eliminate from the award hours spent on unsuccessful claims, stating that to do so would ignore "the relative importance of various issues, the interrelation of the issues, the difficulty in identifying issues, or the extent to which a party may prevail on various issues." *Hensley* quoting No. 75–CV–87–C at 7 (W.D.Mo., Jan. 23, 1981), Record 220.

The Supreme Court said that the district court did not err in refusing to apportion the fee award mechanically on the basis of plaintiff's success or failure on particular issues. *Id.* at 1942. But the Supreme Court remanded because the district court did not properly consider the relationship between the extent of the success and the amount of the fee award. The court cautioned against justifying attorneys' fees solely on the significance of the relief obtained; this alone does not resolve the question of what is reasonable. Instead, the court emphasized the importance of comparing relief sought versus relief obtained, by stating, "A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Id.* at 1942.

The *Hensley* Court clarified how district courts are to handle fees and its guidance is fundamental in deciding the important issues before us. The Court began by identifying the first step in fixing a reasonable fee: determine time reasonably spent and then multiply that figure by the properly fixed reasonable hourly rates. This is referred to as the "lodestar." The Court did not consider various other factors until after that determination was made. Important issues, such as whether the claims were unrelated and could therefore be easily eliminated from the fee award; whether there were excellent results justifying an enhancement of the fee award; and whether there was partial or limited success, were discussed as factors to be considered *after* the basic hours-times-rate calculations were made.

Following *Hensley's* procedure, we will first establish an overall reasonable attorney's fee, and then adjust it based on a comparison of what the plaintiffs endeavored to accomplish with what they ultimately actually accomplished.

## I. THE LODESTAR

### A. *Hours Reasonably Expended*

■ When considering hours reasonably expended, the *Hensley* Court focused on "billing judgment." To exercise billing judgment, counsel for the prevailing plaintiff "should make a good faith effort to exclude from a fee request hours that are

excessive, redundant, or otherwise unnecessary .... Hours that are not properly billed to one's client also are not properly billed to one's adversary ....." *Id.* at 1940. The Supreme Court here is requiring the attorney to make a distinction between raw hours and billable hours before submitting his reasonable hours.

The *Phillips* attorneys' affidavits state that Richard Mays spent 554.3 hours on this case, and Zimmery Crutcher spent 44.-50 hours working on the case while Mr. Mays served on the Arkansas Supreme Court. Defendants' objections to these hour totals are: (1) the attorneys took an inordinate amount of time to accomplish their tasks; (2) that the billing time is too routine to represent actual time and suggests that the records are arbitrary reconstructions and (3) the time needs to be drastically reduced because the plaintiffs failed in their major effort to prove police brutality. The Court will address these objections in this order.

In response to the allegation that inordinate amounts of time were spent to accomplish relatively simple tasks, the Court disagrees. Although there were times during the long history of the case, that the litigation slowed due to a lack of attorney initiative (see Court's pre-trial order of July 1974), the Court is of the opinion that plaintiffs' counsel did an excellent job during the 30 days of actual trial. The Court notes that Richard Mays basically handled the 30 days of trial by himself and that he was well prepared with a firm grasp of both the law and the facts.

■ The defendant correctly cites the *Hensley* case to require the plaintiffs' attorney to keep detailed contemporaneous records that would allow a reviewing court to determine how much time was spent on particular claims. We agree that plaintiffs' records do not meet this standard. However, we also acknowledge that the record-keeping requirement had not developed to this standard when this case was initiated and tried. We do not think it would be fair to penalize the plaintiffs by holding them to a 1983 standard of record-keeping when

their work began many years ago before the more exacting standard had evolved as a prerequisite to an award of fees.

■ The Court will not address the defendant's argument that the hours spent on unsuccessful claims should be subtracted from the total hours at this point in its analysis. Before *Hensley*, the Eighth Circuit used the "Lindy" analysis, *Grunin v. International House of Pancakes*, 513 F.2d 114, 127 (8th Cir.1975), *Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1312 (8th Cir. 1981), and those hours for which the attorneys would not be compensated were subtracted before computing the lodestar. It is our interpretation that *Hensley* changes this aspect of the "Lindy" analysis and precludes this adjustment at the lodestar computation stage when the plaintiffs have not achieved total success. *See Institutionalized Juveniles v. Secretary of Public Welfare*, 568 F.Supp. 1020, 1030 (E.D. Penn.1983).

We conclude that eliminating hours for unsuccessful claims does not properly arise under the narrow inquiry of billing judgment, but must take place under a much broader analytical framework. See below. For purposes of computing the lodestar, the Court will accept the totals as submitted by the attorneys in their affidavits.

### B. *Reasonable Hourly Rate*

■ The work on this case began in 1972 and continued until 1983, with Richard Mays working 425.5 of his total 554.3 hours in the year 1974. Thus much of the fee would ordinarily have been billable 10 years ago. This raises the issue of how to compensate these attorneys for the financial losses they have experienced due to inflation. The court in *Vecchione v. Wohlgemuth*, 481 F.Supp. 776, 790 (E.D.Penn. 1979) addressed this issue and chose "historic rates," rates that would have been reasonable at the time the services were in fact rendered had they been charged by counsel with the experience and expertise these counsel then possessed, over the "current" billing rates. To adjust for the

delay in the receipt of payment the *Vecchione* court computed periodic increases in each attorney's rate, asserting that this incremental approach is a more exact scheme of compensation in that it recognizes the increase in an attorney's market worth that accompanies his or her increasing expertise.

When addressing the issue of adequate compensation for fees incurred many years ago, the court in *Clarke v. Amerada Hess Corp.*, 500 F.Supp. 1067, 1075–76 (S.D.N.Y. 1980), agreed that "historic" fees were appropriate. However, when it computed the historic fee with a compensating increment, the resulting sum was virtually the same as the sum they arrived at when they simply used current rates. To avoid needless figuring, the *Clarke* court used the current billing rate to compute the attorney's fees. *See also Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354, 380–81 (D.C.1983).

Similarly, this Court finds that it tends to reach the same result whether it uses the historic rate properly supplemented or the current rate. The Eighth Circuit has not focused on this issue. However, the objective of the Eighth Circuit is clear: the hourly rate must be reasonable and, more importantly, the ultimate fee must be reasonable. *Cato v. Parham*, 403 F.2d 12, 16 (8th Cir.1968). In conclusion, we find that a reasonable fee can be achieved in this case by simply awarding the current rate for work done long ago.

This Court has reviewed most of the attorney's fee awards handed down by the judges of the Eastern District since 1975 and it has also reviewed many cases from other jurisdictions for guidance in determining the reasonable hourly rate.[1] Some of the recent fee cases decided by other judges that were studied before arriving at the hourly rate in this case are: *Reel v. Arkansas Department of Corrections*, No. LR–C–77–144 (E.D.Ark. June 1983) (unpublished), decided by Judge Roy; *Robinson v. Klassen*, 553 F.Supp. 76 (E.D.Ark.1982) decided by Judge Howard; *Williams & Stanley v. Butler*, No. LR–C–81–633 (E.D.Ark. Nov. 1983) (unpublished), decided by Judge Overton; *Barkins v. Pulaski County*, No. LR–C–81–498 (E.D.Ark. Aug. 1983) (unpublished), decided by Judge Woods.

The Court considers Mr. Mays to be a trial attorney of the first water, possessing exceptional forensic skills. The in-court rate of Arkansas' best trial attorneys in 1974 would have been fixed at around $70 per hour and out-of-court time at approximately $50 per hour. In 1983–84, the comparable rates would be $110 per hour in-court and $85 per hour out-of-court. In this case, the Court will use current rates, fixing the hourly rate for Mr. Mays at $110 per hour in-court and $85 per hour out-of-court, and Mr. Crutcher at $60 per hour out-of-court, as requested.

Using Mr. Mays' affidavit, the Court divides his total time into in-court and out-of-court hours. Then the Court multiplies the reasonable hourly rate times the hours reasonably expended. The resulting lodestar amount is $54,643 determined as follows:

| Mr. Mays: | $110 X 194.30 in-court | = | $21,373 |
|---|---|---|---|
| | 85 X 360.00 out-of-court | = | 30,600 |
| | | | 51,973 |
| Mr. Crutcher: | $ 60 X  44.50 out-of-court | = | 2,670 |
| | Lodestar Total: | | $54,643 |

## II.  ADJUSTMENTS

### A.  *Related Claims*

The *Hensley* Court cautions against stopping once the lodestar is established. We are directed to proceed to analyze the results obtained; particularly in a case such as this in which the plaintiff is the prevailing party even though he achieved very limited success. The Supreme Court states that the first task is to determine whether the unsuccessful claims are related to the successful claims.

In explaining an unrelated claim, the Court refers to "distinctly different claims for relief that are based on different facts and legal theories." *Hensley* 103 S.Ct. at

---

1. The Court is aware of the Eighth Circuit's prohibition on using unpublished opinions as precedent. The unpublished cases cited, however, are not used to establish legal precedent, but rather to review the prevailing fees awarded attorneys in similar litigation in this district.

1940. If it can be said that the work on the unsuccessful claim did not contribute to the ultimate result achieved, then that work can be categorized as unrelated and those hours can simply be subtracted from the total hours.

Apparently, the *Hensley* Court believed that unrelated claims would be the exception rather than the rule. They state that "cases involving such unrelated claims are unlikely to arise with great frequency." *Id.* at 1940. They hypothesize the situation in which the plaintiff's claim involves a common core of facts or related legal theories, and "counsel's time is devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis."

Attorney fee decisions after *Hensley* addressing alleged constitutional violations have approached them with a broad view of "related claims." If facts needed to prove the allegations derived from one conceptual unit, no effort was made to disect those facts into sections to see if they could have been developed separately.[2] In *Inmates of Allegheny County Jail v. Pierce*, 716 F.2d 177 (3rd Cir.1983), a class action on behalf of all inmates in the jail alleged that various elements of their treatment violated their constitutional rights. The alleged violations included the living conditions, use of restraints, adequacy of medical treatment, access to legal material, use of disciplinary segregation, censorship of mail, use of telephones, and restrictions on visitations. The district court ruled in favor of most but not all of the constitutional claims. Noting that the Supreme Court in *Hensley* had rejected using a mathematical reduction formula as a fee adjustment in similar circumstances, the court of appeals directed the district court to consider the relationship between the degree of success of the plaintiffs and their fee award, never raising the issue that the allegations might be subject to division.

Similarly, in *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983), the Tenth Circuit does not consider dividing the alleged constitutional violations into sections for purposes of identifying unrelated claims. The district court found eight constitutional violations in the prison. The court of appeals reversed the district court on three of the eight alleged violations. When considering the fee award, the Tenth Circuit remanded to the district court directing that it consider "whether some adjustment would be necessary based upon the 'results obtained' factor." *Id.* at 556. The court of appeals then added a footnote pointing out that *Hensley* expressly rejects "a mathematical approach of comparing the total number of issues in the case with those actually prevailed upon." *Id.* quoting *Hensley* at 103 S.Ct. at 1940–1941.

Judgment was entered in favor of the defendants in *Institutionalized Juveniles v. Secretary of Public Welfare*, 568 F.Supp. 1020 (E.D.Penn.1983), but the court found that the plaintiffs were the prevailing parties and awarded them attorney fees because their action was considered to be the material factor in bringing about remedial changes with respect to procedural rights of institutionalized juveniles. The court found that the hours plaintiffs devoted to the successful and unsuccessful claims were based on a common core of facts grounded in the same legal theories and were thus related. Stating that the claims were so interrelated that it was not feasible to strike specific hours, the district court made an adjustment to the lodestar to account for the limited success. *Id.* at 1031.

The prevailing parties in *Phillips v. Weeks* argue strenuously that all the claims, both those successfully and those unsuccessfully litigated, are related and

---

**2.** An example of unrelated claims was given in *Coble v. Texas Dept. of Corrections*, 568 F.Supp. 410, 412 (S.D.Tex.1983). In this employment discrimination case, the court was able to disallow time readily identifiable as that spent on the equal pay and benefits issue, and all time spent on statistics. The plaintiffs had not prevailed on the issue of equal pay and benefits, and therefore the court was able to find that these claims could be eliminated as both unrelated and unsuccessful.

cannot be separated for attorney fee purposes. Mr. Mays asserts that his hourly involvement in the illegal use of force cannot be separated from that concerning illegal detention, stating:

> The claims are so related, at least in terms of discovery and other pre-trial preparation that there is simply no way to separate them on an hourly basis. Almost every witness who alleged that he was physically abused also alleged that he was illegally arrested or detained. No claim illustrates this point better than that of the lead plaintiff, himself, Joseph Phillips, who alleged that he went to the police station in the company of his lawyer ... and was illegally detained, verbally abused, assaulted and beaten by police detectives. Although I recognize that police brutality can occur under circumstances other than when an accused is illegally arrested or detained, I can recall few, if any, instances in this case where complainants did not allege both. Not withstanding the potential for conceptual separation of these issues, no client interview, legal pleading or research was done solely or exclusively for the purpose of legally enhancing the issue of police brutality. (See Letter of October 14, 1983.)

Defendants argue that claims on which plaintiffs succeeded were only incidental to their main allegation of police brutality and that they are "by no means indivisible as evidenced by the Court's separate treatment of these particulars in its Memorandum Opinion." (See Defendant's letter of October 1983.)

The Court previously found that the plaintiffs were the prevailing parties on the issues of the citizen complaint procedure, the elimination of the "S" docket and the desegregation of the jail and that the plaintiffs had not succeeded on the issues of police brutality or interrogation of juveniles. While it would be possible to ask a question concerning probable cause for arrest and then not continue the inquiry into abusive police treatment, and in this way to argue that the claims are not related, such

would not be the distinct claims based on different facts, to which the *Hensley* case refers. The Court acknowledges that the proof needed on any one issue *may* derive from a common core of facts: the circumstances surrounding an individual's experience prior to and during his detention and incarceration in the Little Rock city jail.

Since some of the evidence was of this type it is clear, to that extent, the proof was interrelated. But the great bulk of the discovery and the proof in the case could be isolated and segregated to identify that relating to the specific issues upon which the plaintiff prevailed. The Court is of the opinion, although it is arrived at with some hesitation, that a careful analysis would reveal that the issues the plaintiff prevailed upon could for the most part easily be separated from the issues upon which the plaintiff did not prevail. Put another way, if the bulk of such discovery and proof may not be so identified and classified in *this* case, it is doubtful that such a procedure could be followed in any similar case. However, we find it unnecessary to belabor the "related-unrelated" analysis because in this particular situation the same result flows from an analysis of the degree of the plaintiffs' actual success compared to the results sought to be achieved, i.e., under the *Hensley* formulation.

We will, therefore, deal with the plaintiffs' claims as if they were "related" because the same result appears to follow as would be the case were the time-consuming task undertaken of analyzing each bit of discovery and evidence as either related or unrelated.

### B. *Significance of Overall Relief*

After *Hensley*, the primary focus in a case with a partially prevailing plaintiff is on the significance of the overall relief obtained by the plaintiffs in relation to the hours reasonably expended on the litigation. Addressing this issue, plaintiffs' attorney argues in his 1983 letter to the court that:

> [T]he central issue in this lawsuit was whether there was a pattern and practice

of police misconduct, not just police brutality, but illegal detention, racial separation, etc., which the upper echelon police officials permitted, encouraged and/or condoned. The brutality issue took on more significance at trial only because the defendants spent almost all of their time trying to rebut the brutality allegations. The brutality issue also assumed greater significance because plaintiffs tried to buttrice the brutality claims with polygraph evidence.

But even accepting this arguendo, the fee award determination after *Hensley* demands a comparison of the results obtained with the results sought but not obtained in the litigation. To make such a comparison, the Court must evaluate the goals the plaintiffs set in their complaint against the time reasonably expended in the effort to achieve these goals.

One needs only to review the prayer for relief in the plaintiffs' amended complaint to be reminded of the tremendous task that plaintiffs originally undertook:

### PRAYER

WHEREFORE, Plaintiffs pray:

1. That a declaratory judgment issue holding the aforementioned actions of defendants unconstitutional.

2. That a preliminary and permanent injunction issue enjoining and restraining defendants, their successors, officers, agents and employees, and all others acting in concert with them from:

(a) Beating, assaulting, or in any other way threatening or using physical force against plaintiffs or members of their class, unless such force is both reasonable and necessary to protect the officer or produce compliance with his lawful order;

(b) Referring to or addressing plaintiffs and members of their class with derogatory, threatening, humiliating, insulting, obscene or racial epithets and in other ways refusing to accord to plaintiffs and members of plaintiffs' class the respect due citizens from officers of the law;

(c) Refusing medical treatment and care for plaintiffs or members of plaintiffs' class while in the custody of the Little Rock Police Department;

(d) Refusing to give plaintiffs and members of their class proper protection from criminal acts perpetrated against them by police officers or from threats of such criminal acts by police officers.

3. That permanent mandatory injunction issue requiring defendants to establish and promulgate detailed rules and regulations which prohibit and proscribe the unlawful conduct of police officers as set out herein.

4. That permanent injunction issue requiring defendants to present to this Court within thirty (30) days of its order a plan for the establishment of administrative procedures for the receipt, investigation and disposition of citizen complaints of misconduct against police officers of the Little Rock Police Department.

5. That a declaratory judgment issue that in order to prevent plaintiffs' class from suffering further deprivation, such procedures must include but not be limited to the following:

(a) The establishment and use of a standardized, printed complaint form which shall be made easily available by the City of Little Rock or the Civil Service Commission to members of the public.

(b) The establishment of a special governmental unit whose duty it shall be to:

1) Investigate citizen complaints;

2) to prepare findings of fact and recommendations;

3) to deliver copies of its findings and recommendations to the complainant, the police officers involved and to the Chief of Police;

(c) The establishment of a hearing procedure including an impartial hearing examiner, for a full and final determination of the merits of the complaint

which hearing shall be held upon the request of any party pursuant to the procedures set out in Section B above. At such hearing all parties shall be accorded the right to present testimony, to cross-examine witnesses, and to be represented by counsel. The hearing examiner shall prepare written findings and shall deliver copies thereof to the Chief of Police, the complainant and the officers involved. Within a reasonable time after the receipt of the examiner's findings, the Department shall notify the complainant of the disposition of the matter.

6. That permanent injunction issue requiring the Chief of Police to file with the Court detailed semi-annual reports which include the number, nature and disposition of all complaints of police misconduct for a minimum period of two (2) years from the date of said order or until such time as the Court determines that adequate relief has been accorded to plaintiffs' class.

7. That permanent injunction issue requiring defendants to employ a court reporter authorized for the purpose of administering oaths and the taking and transcription of statements voluntarily given by persons accused of criminal conduct.

8. That a permanent injunction issue requiring that defendants refuse to permit defendants to waive their constitutional rights unless an attorney is present or unless said waiver is before a magistrate.

9. That the Court grant counsel fees, costs of Court and such other just and proper relief as it shall deem appropriate.

The plaintiffs' goals were obviously great. They envisioned numerous declarations that the defendants were engaged in various forms of unconstitutional conduct, followed by orders from this Court enjoining this conduct and requiring affirmative action by the defendants to correct these constitutional violations. The plaintiffs wanted these affirmative action plans to be monitored by the Court until the Court was satisfied that the unconstitutional policies and practices had been eliminated.

In order to convince the Court that a situation existed that would warrant such a broad spectrum of remedies, the plaintiffs needed to prove that there was a pattern and practice of police brutality. If this had not been a predicate to the relief they envisioned, if the goals had been as narrow as Mr. Mays states in his letter of October 1983, then the time needed would have been vastly reduced. It is the Court's observation that if the plaintiffs only wanted to prove police misconduct involving arrests without probable cause and detention in segregated facilities and had not tried to prove police brutality, the trial would have taken three or four days rather than over 30 days.

It is this comparison of the relationship between the extent of success and the amount of the fee award that *Hensley* demands. The Supreme Court states:

"[T]he most critical factor is the degree of success obtained.

Application of this principle is particularly important in complex civil rights litigation involving numerous challenges to institutional practices or conditions. This type of litigation is lengthy and demands many hours of lawyers' services. Although the plaintiff often may succeed in identifying some unlawful practices or conditions, the range of possible success is vast. That the plaintiff is a "prevailing party" therefore may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved."

*Hensley* 103 S.Ct. at 1941.

We believe that the results achieved by the plaintiffs, while significant, are limited in comparison to the scope of the litigation as a whole and we will reduce the fee award accordingly. *Id.* at 1943.

The Court will not follow the defendants' suggestion that the plaintiffs are only entitled to 10% of their total fee request. If we were to use required trial time on the successful issues as the sole factor then defendants would have a valid point. But

the Court believes this argument ignores the degree of plaintiffs' overall success including the role of this class action in establishing a citizen complaint procedure. That procedure is one of the remedies the plaintiffs hoped to achieve as a result of proving a pattern or practice of police brutality. Although plaintiffs failed to prove the brutality allegations and therefore were not entitled to the broad spectrum of declaratory relief sought on this issue, the Court found that the plaintiffs' lawsuit was the catalyst behind certain changes. (See Opinion I at 14).) Because a strengthened citizen complaint procedure tends to deter instances of police abuse by making the department more accountable for their actions, the significance of this result offsets to some degree the failure of the plaintiffs in proving the brutality charges.

The defendants' argument seems to be that since the results brought about could have been achieved in 10% of the time, plaintiffs should be awarded 10% of the total fee requested. This approach ignores the proper results comparison. The Court is directed to compare the results to the litigation as a whole. The Court believes that the *Hensley* comparison approach is further recognition and acknowledgement of the discretionary power vested in the district judge in determining attorneys' fees. The district judge observes the trial process firsthand. His overall views and professional impressions are given added importance under *Hensley;* the Supreme Court apparently believes that these impressions may be more valid than some mathematical detailed breakdown of successful versus unsuccessful claims.

In making the results comparison, the Court couples the farranging remedies that the plaintiffs tried to achieve with the tremendous amount of time it took in the effort to develop and put on proof that would justify the requested remedies and then compares this to the success ultimately achieved: here, the declaratory judgment that the "S" docket procedure was unconstitutional, the desegregation of the jail and the establishment of a citizen complaint procedure. As a result of this com-

parison, the Court finds and concludes that the plaintiffs' achievements represent approximately 25% of the ultimate scope of the relief they sought. The fee award will be reduced accordingly.

### C. *Enhancement Considerations*

The plaintiffs' attorneys submit that an upward adjustment of the lodestar amount by 50% should be employed. The *Hensley* Court states: "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Hensley* at 1940.

The Court has already rejected the contention that the overall results of the litigation could be described as excellent. As to the idea that Mr. Mays' very competent performance merits an enhancement for excellence, the Court believes that this has already been taken into consideration within the hourly billing rate analysis and there is no need to duplicate compensation for this. *See Ramos v. Lamm,* 713 F.2d 546, 557 (10th Cir.1983).

Further, we note that even though Mr. Mays ultimately performed admirably on his clients' behalf, there were earlier problems that led to the consideration of dismissal for failure to prosecute. In any event no separate enhancement percentage will be awarded.

### D. *Johnson Factors*

Prior to the *Hensley* case, no attorney fee decision would be complete without a deliberate consideration of the *Johnson* factors as given in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir.1974). In a footnote, the *Hensley* Court tells us that "The district court may consider other factors identified in *Johnson,* though it should note that many of these factors usually are subsumed within the initial calculation of hours rea-

sonably expended at a reasonable hourly rate." *Hensley* 103 S.Ct. at 1940 n. 9.

Although the Fifth Circuit believes that this statement makes the present rule on methods for computing attorneys' fees unclear, *Riddell v. National Democratic Party*, 712 F.2d 165, 170 n. 4 (5th Cir.1983), we do not share this same uncertainty. The *Hensley* case gives the district court adequate directions for analysis of the attorney fee issue in a case involving a partially prevailing plaintiff. We believe that in the process of this analysis we have subsumed the *Johnson* factors and that they therefore require no further discussion.

## III. CONCLUSION

The Court has previously arrived at a lodestar amount of $54,643. The Court has also concluded that the plaintiffs were only successful in bringing about 25% of the results they sought when those results are compared to the scope of the litigation as a whole. Therefore, the lodestar will be reduced to reflect this level of success, resulting in an attorney fee award of $13,-660.75.[3] The Court notes that the adoption of the 25% figure has the indirect effect of giving considerable enhancement to any straight-line assessment of plaintiffs' attorneys' time devoted solely to claims upon which plaintiffs prevailed. So the *Hensley* approach to that extent gives plaintiffs much of what they seek.

The assessment of fair and reasonable attorneys' fees occupies an ever increasing portion of the workload of district judges. *Hensley* appears to recognize what common sense makes clear: No precise mathematical formula can be adopted. Some room for discretion and professional judgment must remain.

An order will be entered accordingly awarding the fee assessed and dismissing the case.

***

3. The $13,660.75 is to be apportioned according to the percentage of work reflected in the attorneys' affidavits. Richard Mays will receive $12,- 993.25, while Zimmery Crutcher will receive $667.50.